# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0745
════════════

JOHN SAMPSON, PETITIONER,

v.

THE UNIVERSITY OF TEXAS AT AUSTIN, RESPONDENT

════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
════════════════════════════════════════════════

**Argued November 3, 2015**

JUSTICE GREEN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE WILLETT, JUSTICE GUZMAN, and JUSTICE BROWN joined, and in which JUSTICE JOHNSON, JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE DEVINE joined as to Part III.

JUSTICE LEHRMANN filed a dissenting opinion, in which JUSTICE JOHNSON, JUSTICE BOYD, and JUSTICE DEVINE joined.

While walking to his office on The University of Texas at Austin (UT) campus, John Sampson tripped on an improperly secured extension cord and fell, injuring his shoulder. The trial court denied UT's plea to the jurisdiction, motion to dismiss, and motion for summary judgment based on a determination that UT waived its governmental immunity under the Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE §§ 101.001–.109. The court of appeals reversed. *Univ. of Tex. at Austin v. Sampson*, ___ S.W.3d___ , ___ (Tex. App.—Austin 2014, pet. granted). We affirm the court of appeals' judgment.

## I. Background

Around 6:30 p.m. on November 21, 2009, Sampson, a tenured law professor at UT, arrived on campus and parked in his usual parking lot to pick up tickets from his office for the football game that evening. UT was hosting a tailgate party on the law school lawn from 5:00 p.m. to 7:00 p.m.—kick-off time. As Sampson was walking to his office on a sidewalk adjacent to the party, he tripped over an extension cord strung across a pedestrian walkway between the parking lot and the law school entrance. Sampson claims that a portion of the cord hit his leg about mid-shin, causing Sampson to pitch forward and land on the sidewalk. Sampson tore his rotator cuff, which required surgery and months of physical therapy.

Austin's World of Rentals (AWR) had assisted with setup for the tailgate party by installing lights in the trees. The lights were powered through extension cords, including the extension cord that allegedly caused Sampson's injury. The extension cord was plugged into an outlet box on the law school's lawn.

Sampson filed a negligence suit against UT and AWR and alleged that UT waived its sovereign immunity pursuant to Texas Civil Practice and Remedies Code section 101.021. Following UT's original answer, UT filed a plea to the jurisdiction, motion to dismiss, and a no-evidence motion for summary judgment based on sovereign immunity. UT argued that Sampson's claim was a premises defect claim under the Tort Claims Act and there was no evidence that UT had actual knowledge of an unreasonably dangerous condition on its premises. Sampson filed an amended petition and response to UT's pleadings, arguing that Sampson's injuries were caused by a condition or use of tangible personal property under the Tort Claims Act, and alternatively, that

2

the extension cord was a special defect or premises defect and UT had actual knowledge of a dangerous condition. In a supplemental plea, UT argued that Sampson failed to plead facts sufficient to show that UT waived its sovereign immunity under any theory—premises defect, special defect, or general negligence. The trial court denied UT's plea to the jurisdiction, motion to dismiss, and motion for summary judgment.

On interlocutory appeal, UT again asserted that Sampson failed to demonstrate a waiver of sovereign immunity under the Tort Claims Act. The Third Court of Appeals reversed the trial court's order and dismissed Sampson's claim against UT for lack of jurisdiction, concluding that Sampson alleged a premises defect claim under the Tort Claims Act and that Sampson failed to present evidence to show that a disputed material fact exists regarding a material element—UT's actual knowledge of an unreasonable risk of harm. ___S.W.3d at ___. Sampson appealed to this Court, arguing that his negligence claim was based on a condition or use of an item of tangible personal property, or alternatively, a premises defect, and that there was sufficient evidence to survive UT's motion.[1] For the reasons explained below, we affirm.

## II. Standard of Review

### A. Tort Claims Act

Generally, "immunity from suit implicates courts' subject-matter jurisdiction" for lawsuits in which the state or certain governmental units have been sued, unless the state consents to suit. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012); *accord Tex. Dep't of Parks & Wildlife*

---

[1] In this Court, Sampson conceded that the cord was not a special defect under the Tort Claims Act and therefore dropped that argument.

*v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (per curiam)). A state agency, such as UT, shares this governmental immunity. *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976); *see* TEX. CIV. PRAC. & REM. CODE § 101.001(3)(D). The state or governmental unit can be sued only if the Legislature waives immunity in "clear and unambiguous language." TEX. GOV'T CODE § 311.034. There are two distinct principles of sovereign immunity: immunity from suit and immunity from liability. *Miranda*, 133 S.W.3d at 224. The Tort Claims Act creates "a unique statutory scheme in which the two immunities are co-extensive: 'Sovereign immunity to suit is waived and abolished to the extent of liability created by [the Tort Claims Act].'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE § 101.025(a)). Thus, a governmental unit is immune from suit unless the Tort Claims Act expressly waives immunity, which it does in three areas when the statutory requirements are met: (1) use of publicly owned automobiles; (2) injuries arising out of a condition or use of tangible personal property; and (3) premises defects. *Id.* at 224–25 (citing *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 554 (Tex. 2002)); *see* TEX. CIV. PRAC. & REM. CODE §§ 101.001–.109.

### B. Evidentiary Standard

Whether a court has subject matter jurisdiction is a question of law, properly asserted in a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225–26. "Whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law reviewed *de novo*." *Id.* at 226. Generally, the standard mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). *Id.* at 228. "[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal

4

plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction." *Id.* at 221. When the evidence submitted to support the plea implicates the merits of the case, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.* at 228 (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

### III. The Nature of Sampson's Claim: Tangible Personal Property or Premises Defect

The Tort Claims Act waives immunity for "personal injury and death so caused by a condition or use of tangible personal or real property." TEX. CIV. PRAC. & REM. CODE § 101.021(2). If the claim "arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property." *Id.* at § 101.022(a). The duty owed to a licensee on private property requires that "a landowner not injure a licensee by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992) (citing *State v. Tennison*, 509 S.W.2d 560, 562 (Tex. 1974)). The Tort Claims Act thus applies different standards of care upon a governmental unit for negligence claims based on "a condition or use of tangible personal property" and claims based on a "premises defect." *See* TEX. CIV. PRAC. & REM. CODE §§ 101.021(2) (tangible personal property), 101.022(a) (premises defect). Whether a claim is based on a premises defect is a legal question. *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 866 (Tex. 2002) (per curiam) (citing *State v. Burris*, 877 S.W.2d 298, 299 (Tex. 1994) (per curiam)).

Therefore, we must first decide whether the alleged negligence here is based on a condition or use of tangible personal property, or a premises defect.

Sampson argues first that his claim falls within the Tort Claims Act's waiver of immunity for injuries arising out of a condition or use of tangible personal property. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(2). Relying on court of appeals' decisions, Sampson contends that the extension cord he tripped on was clearly "movable, portable and temporary in nature," and therefore was tangible personal property under the Tort Claims Act that is subject to the general negligence standard. In the alternative, Sampson argues that the claim falls under the Tort Claims Act's waiver of immunity for premises defects. Accordingly, we must address what constitutes a "use" of tangible personal property claim, a "condition" of tangible personal property claim, and a "premises defect" claim to fully dispose of Sampson's arguments on appeal.

In *Texas Department of Parks and Wildlife v. Miranda*, this Court considered whether a claim can be both a premises defect claim and a claim relating to a condition or use of tangible property, and held that it cannot. 133 S.W.3d at 233. Furthermore, this Court concluded that the plaintiffs' allegation of injury caused by a falling tree limb constituted "an allegation of a condition or use of real property and [was] an allegation of a premises defect." *Id.* at 230. *Miranda* relied on an earlier case, *Tennison*, in which this Court rejected the argument that the Tort Claims Act created "'two entirely separate grounds of liability' for negligent use or condition of real property and premise[s] defect, but instead interpret[ed] the premises defect provision to further limit the waiver of immunity for negligent use or condition of real property." *Id.* at 233 (quoting *Tennison*, 509 S.W.2d at 562). *Miranda* made clear that a claim for a condition or use of real property is a premises

6

defect claim under the Tort Claims Act, and therefore the Tort Claims Act waives immunity for two distinct tort causes of action: one arising from tangible personal property and one arising from a premises defect. *Id.* at 230; *see* TEX. CIV. PRAC. & REM. CODE §§ 101.021(2), .022.

Additionally, in *Miranda*, this Court recognized the different standards of care attached to the two causes of action and explained that a plaintiff cannot plead around the heightened standard for premises defects, which requires proof of additional elements such as actual knowledge, by casting his claim instead as one for a condition or use of tangible personal property: "The Tort Claims Act's scheme of a limited waiver of immunity from suit does not allow plaintiffs to circumvent the heightened standards of a premises defect claim contained in section 101.022 by re-casting the same acts as a claim relating to the negligent condition or use of tangible property." *Miranda*, 133 S.W.3d at 233. To effectuate the Legislature's heightened requirements for a premises defect claim under section 101.022(a), the premises defect provision of the Tort Claims Act must limit the Tort Claims Act's provision for negligent use or condition of tangible property. *See id.* Therefore, if a claim is one for a premises defect, it must be analyzed under section 101.022 and not as a claim for a condition or use of tangible property under section 101.021(2). *See id.* Accordingly, we must first consider the nature of Sampson's claim and whether it is properly categorized as based on a premises defect or a condition or use of tangible personal property; if the former, the claim must be analyzed according to the heightened requirements of section 101.022. *See id.*

The Tort Claims Act does not define "premises defect" or "tangible personal property." Nor have we defined those terms within the context of the Tort Claims Act. We note at the outset, however, that this Court, both within and outside of the Tort Claims Act, has consistently treated

7

slip/trip-and-fall cases as presenting claims for premises defects. *See, e.g.*, *The Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010) (per curiam) (analyzing a student's claim as a premises defect where the student, while riding a bicycle, tripped on a metal chain that stretched across a service driveway and the student pled the claim as a premises defect under the Tort Claims Act); *Univ. of Tex.–Pan Am. v. Aguilar*, 251 S.W.3d 511, 512–13 (Tex. 2008) (per curiam) (analyzing the case under a premises defect theory where a student tripped over a water hose lying across a campus sidewalk and broke his knee and the student alleged a premises defect claim under the Tort Claims Act, which the Court did not disagree with); *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407–09 (Tex. 2006) (analyzing ice on a grocery store floor from a self-serve soft drink dispenser, which caused a customer to fall and sustain injuries, as a premises defect, outside of the Tort Claims Act's context); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 263–64 (Tex. 1992) (concluding, outside of the Tort Claims Act, that a slippery substance on a grocery store floor, which caused the customer to slip and sustain injuries, was a premises defect and not a negligent activity); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 753–54 (Tex. 1970) (analyzing a "wool, pile-type rug" with "loose-weave," which laid on the store's otherwise smooth asphalt tile floor and caused a woman to trip and fall, as a premises defect, outside of the Tort Claims Act's context). Creative pleading does not change the nature of a claim. *See Miranda*, 133 S.W.3d at 233.

"For four decades, Texas jurists have repeatedly expressed concerns about the difficulty of discerning the Legislature's intended meaning behind the words 'condition or use' as they appear in the . . . Tort Claims Act." *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 49 (Tex. 2015) (citing *Tex. Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 590–91 (Tex. 2001) (Hecht, J., concurring)

8

(recounting multiple instances when members of the Court repeatedly urged the Legislature to give guidance on how to interpret the "use-of-property standard" in the Tort Claims Act, to no avail)); *see Lowe*, 540 S.W.2d at 301–02 (Greenhill, C.J., concurring) ("The purpose of this concurring opinion is to encourage the Legislature to take another look at the Tort Claims Act, and to express more clearly its intent as to when it directs that governmental immunity is waived."); *see also State v. San Miguel*, 981 S.W.2d 342, 346 (Tex. App.—Houston [14th Dist.] 1998), *rev'd on other grounds*, 2 S.W.3d 249 (Tex. 1999) (per curiam) ("Determining whether the particular object that caused the injury falls into the category of 'premises defect' or 'use or condition of property' is often a difficult task."). However, we have never used the fact that the "'condition or use' provision is 'difficult to understand and difficult to apply'" as an excuse to bypass our duty to interpret and apply the statute as written. *Abutahoun*, 463 S.W.3d at 49 (quoting *Robinson v. Cent. Tex. MHMR Ctr.*, 780 S.W.2d 169, 171 (Tex. 1989)). In *DeWitt v. Harris County*, this Court explained that with "premise[s] defects, liability is predicated not upon the actions of the governmental unit's employees but by reference to the duty of care owed by the governmental unit to the claimant for premise and special defects as specified in section 101.022 of the . . . Tort Claims Act." 904 S.W.2d 650, 653 (Tex. 1995). Under the Tort Claims Act, the duty owed for a premises defect is that owed to a licensee. TEX. CIV. PRAC. & REM. CODE § 101.022(a) ("[I]f a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises."). Rather than expressly imposing a particular duty, as the Legislature did in section 101.022(b) with the "duty to warn" in special defect cases, the Legislature linked the applicable duty under section 101.022(a)—for

9

premises defects—to the common law. *See Payne*, 838 S.W.2d at 237. "That duty requires that a landowner not injure a licensee by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *Id.* Furthermore, "it is important to remember that the Tort Claims Act does not create a cause of action; it merely waives sovereign immunity as a bar to a suit that would otherwise exist." *City of Tyler v. Likes*, 962 S.W.2d 489, 494 (Tex. 1997) (explaining that "unless [the plaintiff] would have a claim for mental anguish under common law against a private defendant, we need not reach the question of whether mental anguish is a 'personal injury' for which the Legislature has waived the City's sovereign immunity" under section 101.021 of the Tort Claims Act). In *State v. Shumake*, this Court considered the effect of the recreational use statute on a premises defect claim brought under the Tort Claims Act against the state. 199 S.W.3d 279, 284–85 (Tex. 2006). This Court explained: "Determining whether a 'trespasser' on state-owned recreational land has a claim for injuries caused by the unsafe condition of the property requires that we construe the statute along with the common law principles the statute ostensibly incorporates." *Id.* at 284. Here, the Tort Claims Act ostensibly incorporates common law principles by using the term "premises defect," a term developed by the common law, and by linking the duty of care owed under the Tort Claims Act to common law. *See Payne*, 838 S.W.2d at 237; *id.* at 245 (Mauzy, J., dissenting). We therefore look to the common law premises defect cause of action for guidance in interpreting "premises defect" under the Tort Claims Act. *See* TEX. GOV'T CODE § 311.023(4) ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may

consider . . . common law or former statutory provisions, including laws on the same or similar subjects.").

The definition of "premises defect" has been developed at common law through case law distinguishing between two subspecies of negligence: causes of action for premises liability and negligent activity. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997); *Keetch*, 845 S.W.2d at 264. "We have recognized that negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010). When distinguishing between a negligent activity and a premises defect, this Court has focused on whether the injury occurred by or as a contemporaneous result of the activity itself—a negligent activity—or rather by a condition created by the activity—a premises defect. *Keetch*, 845 S.W.2d at 264. "At some point, almost every artificial condition can be said to have been created by an activity," but we have repeatedly "decline[d] to eliminate all distinction between premises conditions and negligent activities." *Id.*; *see also Del Lago Partners, Inc.*, 307 S.W.3d at 776. Just as at common law, where the artificial condition upon which a premises liability claim is based may be created by an activity, we conclude that under the Tort Claims Act, the dangerous condition upon which a premises defect claim is based may be created by an item of tangible personal property.[2]

---

[2] *Miranda* made clear that a claim for a condition or use of real property is a premises defect claim under the Tort Claims Act, and that there are two distinct causes of action—one based on a condition or use of tangible personal property and one arising from a premises defect. 133 S.W.3d at 230; *see* TEX. CIV. PRAC. & REM. CODE §§ 101.021(2), .022.

The distinction lies in whether it is the actual use or condition of the tangible personal property itself that allegedly caused the injury, or whether it is a condition of real property—created by an item of tangible personal property—that allegedly caused the injury. We seek to clarify this distinction.

Within the Tort Claims Act's context, we have defined "condition" as "either an intentional or an inadvertent state of being." *Abutahoun*, 463 S.W.3d at 49 (quoting *Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex.1975)). To state a "condition" claim under the Tort Claims Act, there must be an allegation of "defective or inadequate property."[3] *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex. 1983); *see Dall. Cty. v. Posey*, 290 S.W.3d 869, 872 (Tex. 2009) (per curiam) ("For a defective condition to be the basis for complaint, the defect must pose a hazard in the intended and ordinary use of the property."). Furthermore, we have defined "use" to mean "to put or bring into action or service; to employ for or apply to a given purpose." *Miller*, 51 S.W.3d at 588 (quoting *Tex. Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex. 2001)). As with negligent activity claims under common law, to state a "use" of tangible personal property claim under the Tort Claims Act, the injury must be *contemporaneous* with the use of the tangible personal property—"[u]sing that property must have actually caused the injury." *Id.* Allegations of mere non-use of property cannot support a "use" claim under the Tort Claims Act. *See, e.g.*, *White*, 46 S.W.3d at 869–70 (concluding that the failure to use a pump to dissipate gasoline vapors did not support a

[3] This Court has not addressed the meaning of "inadequate" in the context of a claim based on a condition of tangible personal property. We have mentioned "inadequate" in the context of "use" claims, holding that such a claim based on the complete lack of an integral safety feature rather than a "merely inadequate" feature can effect a waiver of governmental immunity under the Tort Claims Act, whereas a "non-use" claim based on "the failure to provide a *more effective* safety feature" does not waive the governmental unit's immunity. *Tex. A&M Univ. v. Bishop*, 156 S.W.3d 580, 584 (Tex. 2005). We express no opinion on the meaning of "inadequate" in the "condition" context, however.

claim for negligent use of tangible personal property). Additionally, we have explained that a governmental unit "does not 'use' tangible personal property . . . within the meaning of section 101.021(2) by merely providing, furnishing, or allowing . . . access to it." *Rusk State Hosp.*, 392 S.W.3d at 98. However, non-use and furnishing access are distinguishable from situations in which a governmental unit "provided equipment that lacked an integral safety component." *See Bishop*, 156 S.W.3d at 584 (explaining that providing equipment that lacks "an integral safety component" represents "the outer bounds of what we have defined as use of tangible personal property," and we "appl[y] [our precedent] narrowly only when an integral safety component is entirely lacking rather than merely inadequate"). The case at hand requires us to differentiate between a tangible personal property claim and a premises defect more narrowly. Drawing from definitions developed both under the Tort Claims Act and at common law, we must determine whether a claim arises from a use or condition of tangible personal property or a premises defect. This determination turns on whether the contemporaneous "action or service" (use) or "state of being" (condition) of the tangible personal property itself caused the injury, or whether the tangible personal property created the dangerous real-property condition, making it a premises defect. Just as at common law, where an activity may create a condition of the premises, under the Tort Claims Act an item of tangible personal property may create a condition of the premises, resulting in a premises defect claim. *See Keetch*, 845 S.W.2d at 264.

Sampson rejects two cases relied upon by UT, which address tripping hazards on university campuses, arguing they are inapposite because the claims in those cases were analyzed only as premises defect claims, having not been pled in the alternative under a "use" or "condition" of

13

tangible personal property theory of liability. *See Aguilar*, 251 S.W.3d at 512; *Hayes*, 327 S.W.3d at 115. As previously explained, however, if a claim is properly determined to be one for premises defect, a plaintiff cannot circumvent the true nature of the claim by pleading it as one for general negligence, *see Miranda*, 133 S.W.3d at 230–33, and both cases illustrate quintessential premises defect claims. In *University of Texas–Pan American v. Aguilar*, a student of the university tripped on a water hose lying across a campus sidewalk and broke his knee as he was walking to class. 251 S.W.3d at 512. The case was pled only as a premises defect cause of action and, without discussion, we referred to the case as a premises defect claim and analyzed the issue of actual knowledge, concluding that the plaintiff failed to satisfy that element of the claim. *Id.* at 512–14. In *Aguilar*, the water hose was hooked to a spigot and stretched across the campus sidewalk. *Univ. of Tex.–Pan Am. v. Aguilar*, No. 13-06-450-CV, 2007 WL 610731, *4 (Tex. App.—Corpus Christi Mar. 1, 2007), *rev'd on other grounds*, 251 S.W.3d at 511–12. Similarly, in *The University of Texas at Austin v. Hayes*, the plaintiffs did not raise or argue a theory based on use or condition of tangible personal property when a metal chain stretched across and blocked a campus driveway, causing a bicycle accident. 327 S.W.3d at 115. In that case, the metal chain, placed across the service driveway in preparation for a football game the following day, was suspended in the air. *Id.* We concluded that the claim was for premises defect, as opposed to a special defect, without discussion of whether it may have been a tangible personal property claim, and held that the plaintiff failed to establish a premises defect claim for failure to satisfy the actual knowledge element. *Id.* at 118. Neither *Aguilar* nor *Hayes* addressed the distinction between a claim based on tangible personal property and a premises defect claim.

The distinction between a use or condition of tangible personal property claim as opposed to a premises defect claim, however, is whether it was the contemporaneous, affirmative action or service (use) or the state of being (condition) of the tangible property itself that allegedly caused the injury, or whether it was a condition created on the real property by the tangible personal property (a premises defect). *See Shumake*, 199 S.W.3d at 284 (explaining that negligent activity claims require that "the claimant's injury result from [the] contemporaneous activity itself rather than from a condition created on the premises by the activity"); *Keetch*, 845 S.W.2d at 264 (explaining that a premises defect claim exists when the injury allegedly occurred as a result of a condition created by the activity). In *Aguilar* and *Hayes*, the water hose and metal chain allegedly caused the injuries not because of the inherent nature of the tangible personal property itself or the contemporaneous use of the tangible personal property, but because of the tangible item's placement—strung, pulled taut—creating a hazardous real-property condition. *Aguilar*, 251 S.W.3d at 512; *Hayes*, 327 S.W.3d at 115; *cf. Overton Mem. Hosp. v. McGuire*, 518 S.W.2d 528, 528–29 (Tex. 1975) (per curiam) (characterizing a claim for injuries sustained after a patient fell from a hospital bed without rails as a claim based on condition or use of tangible personal property under the predecessor to the Tort Claims Act—it was the hospital bed itself that allegedly caused an injury and not a dangerous real property condition created by the bed's placement or position). Here, the electrical extension cord was strung across the pedestrian walkway hours earlier by either a UT or AWR employee. The dangerous condition was the way the extension cord was positioned over the concrete retaining wall, resulting in a gap between the ground and the cord. The injury did not result from the use of tangible personal property because a UT employee was not putting or bringing the cord into action or service

15

*at the time* of the injury. *Miller*, 51 S.W.3d at 588 (defining "use" to mean "to put or bring into action or service; to employ for or apply to a given purpose. . . . Using that property must have actually caused the injury.") (internal citation omitted). The cord was not, for example, being pulled taut across the walkway by a UT employee contemporaneously with Sampson's fall, which would have been a "use" of the tangible personal property. *See Keetch*, 845 S.W.2d at 264 (explaining that there was no "ongoing activity" and therefore the injury was not contemporaneous when a store patron slipped and fell approximately thirty minutes after a Kroger employee had sprayed the plants and created the slick spot on the floor). Nor was the gap between the ground and the cord a condition of tangible personal property because it was not the defective state of the actual cord that resulted in the injury. *See Abutahoun*, 463 S.W.3d at 49 (quoting *Sparkman*, 519 S.W.2d at 858) (defining "condition" as "either an intentional or an inadvertent state of being"); *Salcedo*, 659 S.W.2d at 32 (requiring "an allegation of defective or inadequate property when 'some condition' of property is a contributing factor to the injury"). The cord was not, for example, frayed with exposed wire that touched Sampson as he walked by, shocking him, which would have been an injury caused by the condition of the tangible property. Instead it was the static placement of the extension cord on the real property, the way it was hung over the concrete retaining wall resulting in a gap between it and the ground, that created the dangerous condition—a tripping hazard. The extension cord thus created a condition on the real property—a premises defect. *See Miranda*, 133 S.W.3d at 230. Just as at common law, where slip/trip-and-fall cases have consistently been treated as premises defect causes of action, under the Tort Claims Act, when an item of tangible personal property creates a condition of real property that results in a slip/trip-and-fall injury, it is properly

16

characterized as a premises defect cause of action. We therefore hold that Sampson's negligence claim is properly characterized as based on a premises defect, even though the dangerous condition on the real property was created by tangible personal property.

## IV. Evidence of Actual Knowledge

Sampson argues that even if his claim is one of premises defect, he presented sufficient evidence to establish a waiver of immunity under section 101.022(a). However, UT alleges that Sampson's premises defect claim fails to fall within a waiver of UT's immunity because Sampson is unable to show that UT had actual knowledge of an unreasonable risk of harm. When a claim arises from a premises defect under the Tort Claims Act, "the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises." TEX. CIV. PRAC. & REM. CODE § 101.022(a). Sampson does not allege that he paid for use of the premises, so we analyze his claim using a licensee standard. The duty owed to a licensee requires that "a landowner not injure a licensee by willful, wanton or grossly negligent conduct, and that the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the licensee is not." *Payne*, 838 S.W.2d at 237 (citing *Tennison*, 509 S.W.2d at 562); *accord* RESTATEMENT (SECOND) OF TORTS § 342 (1965). Absent willful, wanton, or grossly negligent conduct, a licensee must prove the following elements to establish the breach of duty owed to him:

> (1) a condition of the premises created an unreasonable risk of harm to the licensee; (2) the owner actually knew of the condition; (3) the licensee did not actually know of the condition; (4) the owner failed to exercise ordinary care to protect the licensee from danger; (5) the owner's failure was a proximate cause of injury to the licensee.

17

*Payne*, 838 S.W.2d at 237. Therefore, if UT can show there was no evidence of one of these elements, its plea to the jurisdiction should be granted. *See Aguilar*, 251 S.W.3d at 512, 514.

UT alleges that there is no evidence it "actually knew" of the dangerous condition created by the extension cord. Because the jurisdictional evidence implicates the merits, UT's burden is similar to that of a movant for summary judgment. *See Miranda*, 133 S.W.3d at 227–28. Once UT asserts and supports with evidence that the trial court lacks jurisdiction, we require Sampson to show only that there is a disputed material fact regarding the jurisdictional issue. *See id.* at 228. We take as true all evidence favorable to the nonmovant, Sampson, indulging every reasonable inference and resolving any doubts in Sampson's favor. *See id.* "If the evidence raises a fact question on jurisdiction, then the trial court cannot grant the plea to the jurisdiction," and the fact question will instead be resolved by the fact finder. *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414 (Tex. 2008) (per curiam) (citing *Miranda*, 133 S.W.3d at 227–28). If the evidence "fails to raise a fact question, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.*

"Actual knowledge, rather than constructive knowledge of the dangerous condition is required." *Tennison*, 509 S.W.2d at 562. Furthermore, the licensee must show that the owner actually knew of the "dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition c[ould] develop over time." *Hayes*, 327 S.W.3d at 117 (alteration in original) (quoting *Stewart*, 249 S.W.3d at 413–14). Hypothetical knowledge will not suffice. *See id.* Additionally, that the owner could have done more to warn the licensee is not direct evidence to show that the owner had actual knowledge of the dangerous condition. *Id.* at 117–18. "Although there is no one test for determining actual knowledge that a condition presents an unreasonable risk

18

of harm, courts generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition." *Aguilar*, 251 S.W.3d at 513.

At the tailgate party that evening, AWR provided four strands of string lights to hang in the trees. The parties dispute whether UT or AWR laid the extension cord used to power those lights, which allegedly caused Sampson to trip. The only evidence regarding the fall is from Sampson himself: "[A]s I rounded the bend and headed towards the atrium I tripped when my right shinbone caught a trip wire . . . it was coming down through the ivy on the . . . concrete retaining wall . . . . I then pitched forward . . . . I landed square on my right shoulder with full force." Sampson described the condition of the cord as coming over from a higher point, the retaining wall, then down through the ivy at an angle. The cord was not secured or held by tape to either the retaining wall or the ground, nor were there any warning cones to mark that the cord came down at an angle and crossed the walkway. Finally, the area was "very dimly illuminated."

UT presented the following evidence that AWR, not UT, laid the cord: (1) AWR used yellow extension cords, UT used black extension cords, and Sampson testified that the extension cord he tripped over was yellow; (2) George Bates, an AWR employee, discussed departing from AWR's usual procedure of taping cords down and instead routing one of the tree light extension cords above the walkway through the trees; and (3) the ten extension cords provided by UT for the event were arguably used for different purposes, such as providing electricity for food stations, not to power the tree lights. UT also presented evidence that no UT employee observed the presence of a cord in the area where Sampson fell before his fall: (1) no UT personnel testified to seeing a cord where Sampson fell; (2) UT did not complete a full walk-through after setup was complete and, instead,

19

UT employees simply "double-checked" that there was lighting and electrical power by observing that the lights and power were functioning—because they viewed the lights on, there was no need for the UT employees to investigate the power source further; and (3) when the tree lights went out, a UT employee, Natzyeli Leugers, simply "saw that the cable was unplugged," did not see anyone near the area, and plugged a cord back in, without examining the extension cords or their placement to determine why the cord came unplugged. Finally, Leugers testified that there had been no reports of prior injuries or problems at past events held in the same area. In sum, UT argues that Sampson only presented evidence of "hypothetical knowledge," and therefore the action should be dismissed for lack of jurisdiction.

Given UT's evidence, it is Sampson's burden to raise an issue of material fact as to jurisdiction. Sampson argues that when viewing the facts in the light most favorable to him, there is evidence that UT employees knew about the dangerous condition of the cord: (1) UT was responsible for laying the cord; (2) UT employees inspected the setup, including the placement of the cord; and (3) a UT employee replugged the cord after it had become unplugged halfway through the event. As evidence that UT was responsible for laying the cord, Sampson presented evidence that: (1) UT was responsible for bringing power from the outlet box to the area where electricity was needed, which in this case included UT running the extension cord across the walkway; (2) AWR employee Bates understood on this occasion that UT would run the cord across the walkway for the event, suggesting to Leugers that it would be best to run the cord in the trees over the walkway to prevent it from creating a tripping hazard; (3) Bates also testified that AWR always duct-tapes extension cords along the ground or to the wall, evidencing this cord was not run by AWR because

20

it was not taped down; (4) an internal UT work order requested UT Electrical to provide electrical for the event along with ten extension cords; (5) Rudy Moreno and Agustin Carrasco, UT employees, walked the site with Bates discussing setup for the event; and (6) Carrasco spent two hours running electricity for the event. Furthermore, Sampson points to evidence that UT employees "inspect[ed] the set up prior to the event, and after the lights had been strung," and that UT employees "'double-checked' everything before the event and made sure that 'everything was fine'" to show that UT actually knew of the cord's placement in the walkway. In addition, halfway through the event, about 6:00 p.m., the extension cord powering the lights was pulled out of the outlet and Leugers discovered the unplugged cord and reconnected it. Finally, Sampson argues that the lack of reports of prior injuries or of the potential danger represented by the condition does not imply that UT lacked actual knowledge that the extension cord presented an unreasonable risk of harm.

It is undisputed that AWR employees installed the lights in the trees. Typically with UT events, UT runs the power from the outlet to wherever the electricity is needed. While UT was responsible for turning on the electricity for the outlets and unlocking the outlet boxes, no one testified that UT actually did place the extension cord that caused Sampson's injury. Instead, there was repetitive testimony from UT and AWR employees who "did not recall" or "did not know" who actually laid the extension cord at issue. AWR contracted to provide six extension cords, while UT was responsible for providing ten extension cords. Bates recalled AWR taping one extension cord to the ground in a different area of the south lawn that day and explained that AWR "always duct-taped any extension cords down to the ground or to the wall." Furthermore, Bates stated in deposition testimony that on November 16, 2009, five days before the event, he discussed stringing

21

the extension cord for the tree lights above the walkway through the trees, so that it would not be a tripping hazard, with Leugers and Ashlie Murray. While Bates explained that UT generally has someone "bring the electricity to us and then plug in," when asked "whether that happened for this event," Bates did not know. Indulging every reasonable inference in Sampson's favor, as we must, it could be concluded that UT laid the extension cord. *See Miranda*, 133 S.W.3d at 228. While evidence of who laid the cord is one factor in determining UT's actual knowledge, the critical inquiry here is not who initially placed the cord, but whether UT had actual knowledge of the dangerous condition created by the cord's position at the time of Sampson's fall, regardless of who laid it. *See Hayes*, 327 S.W.3d at 117–18.

Both Leugers and Murray explained in deposition testimony how, mid-way through the event, about 6:00 p.m., the tree lights lost power. Each went separate ways to try to remedy the situation, and Leugers found the source of the problem—the extension cord powering the lights had come unplugged from the power outlet. Leugers's testimony provided:

> Q: When the lights went out, what happened?
> A: Well, [Murray] and I tried to figure it out. And we split. I happened to go that way, and I saw that the cable was unplugged from the electrical cord - - from the plug.
> Q: Okay. When you say "that way," you went toward the outlet box . . . ?
> A: Yes. Correct.
> Q: Okay. Where did you see - - you actually saw that the extension cord was unplugged from the power outlet?
> A: When I walked all the way up here, that's when I saw that.
> . . . .
> Q: When you went in and reconnected the power source to the lights that were connected to the bulbs . . . did you see anyone on the ground as you walked towards the power source?
> A: No.

22

Q: Did you see anyone helping anyone up off the ground, as though that person had f[allen]?
A: No.
Q: And how long, in your estimation, were the lights out?
A: Between three and five minutes.
. . . .
Q: Did you look, after you discovered that it had become unplugged, to try to figure out why it became unplugged?
A: No.

At most, this testimony creates an inference that Leugers was aware something caused the extension cord to become unplugged. While circumstantial evidence can establish actual knowledge, such evidence must "'either directly or by reasonable inference' support that conclusion." *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (quoting *Stewart*, 249 S.W.3d at 415). An inference is not reasonable if premised on mere suspicion—"some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Id.* (quoting *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003) (per curiam)). Leugers re-plugging the extension cord leads at most to suspicion that she was aware the cord was a tripping hazard; it cannot be reasonably inferred that taking three to five minutes to identify why the lights went out and to plug the cord back into the socket meant that Leugers actually became aware of how the cord was positioned over the retaining wall and that it created a tripping hazard. Regarding the "inspection of the set-up" by UT employees, the evidence shows that a general observation and walk-through occurred, not a detailed review of the premises:

Q: Can you read me that entry?
A[Murray]: 1:30 to 2:30, [Moreno] from Maintenance here to make sure lights are working.
Q: Did that actually occur?
A: Yes.

23

. . . .

Q: Who else - - well, what was your understanding that [Moreno] was there for?
A[Murray]: Just to make sure everything was up and running.

. . . .

Q: Okay. Now, tell me, did [Moreno and Carrasco] - - were they checking the electricity to make sure it was working? What were they doing there, to your understanding?
A [Leugers]: Yeah, just checking that we had power and that everything was fine.
Q: So at the time that they were there, was the lighting already set up by [AWR]?
A: I believe so.

. . . .

Q: Did you all look at the lighting together while they were there, to make sure it was working?
A [Leugers]: We just looked up and saw it lit.  I mean, that's the only thing I can think of.

Furthermore, in an email between two UT employees about the event, one employee explained, "I spoke with . . . one of our Events folks & she told me that the vendor set up the extension plugs that our Professor had tripped over BUT she had everything was [sic] double checked by a UT Technical Crew Leader . . . before the event started."  This evidence shows that UT employees were physically present and that the light bulbs and other items at the tailgate were powered and functioning.  That employees were present, "double checked" everything, and made sure "everything was up and running," without more, does not show actual knowledge of the dangerous position of the cord at the time of the injury—that it was strung through the ivy and over the walkway in a manner that presented a tripping hazard.

In *City of Dallas v. Thompson*, we addressed the City's actual knowledge regarding a premises defect claim under the Tort Claims Act.  210 S.W.3d 601, 603 (Tex. 2006) (per curiam).  The evidence showed that in the hours before the plaintiff's trip and fall on the lip of an improperly secured expansion-joint coverplate protruding from the floor at the airport, "City employees had

24

been in the area . . . and probably had walked over it." *Id*. Furthermore, the "City knew that the coverplate could become loose and raise suddenly or over time with ordinary wear and tear." *Id.* We explained that "the fact that materials deteriorate over time and may become dangerous does not itself create a dangerous condition, and the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time." *Id.* (citing *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 100–02 (Tex. 2000)). Without evidence showing how long the allegedly protruding plate existed, "the proximity of the employees is no evidence of actual knowledge." *Id.* at 603–04 (citing *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 816 (Tex. 2002) ("An employee's proximity to a hazard, with no evidence indicating how long the hazard was there, merely indicates that it was *possible* for the premises owner to discover the condition.")). Finally, although the City added a screw to the end of the coverplate where it was protruding after the injury, we reiterated that "[e]vidence that an owner or occupier knew of a safer, feasible alternative design, without more, is not evidence that the owner knew . . . that a condition on its premises created an unreasonable risk of harm." *Id.* at 604 (quoting *Daenen*, 15 S.W.3d at 102). Despite the evidence of prior falls, employees in the area, and a feasible, safer alternative design, we held that the plaintiff failed to present any evidence of the City's actual knowledge of the protruding coverplate. *Id.* at 603–04.

There is no more evidence of actual knowledge here than there was in *Thompson*. At most, there is evidence that UT employees initially laid the extension cord, that the extension cord became unplugged at some point during the event and was simply plugged back in without further investigation, and that the power was verified to be up and running for the tailgate party. However,

"the proximity of the employees is no evidence of actual knowledge." *Id.* at 603 (citation omitted). The fact that UT employees were in the area does not mean they actually observed the extension cord, or the specific portion of the extension cord that created the tripping hazard. Furthermore, the fact that AWR employees and UT employees discussed methods of stringing the cord—through the trees above the walkway, in order to avoid a tripping hazard—does not create actual knowledge that the decision to lay the cord on the ground created a dangerous condition because "[a]wareness of a potential problem is not actual knowledge of an existing danger." *City of Denton v. Paper*, 376 S.W.3d 762, 767 (Tex. 2012) (per curiam) (quoting *Reyes v. City of Laredo*, 335 S.W.3d 605, 609 (Tex. 2010) (per curiam)). In *Thompson*, that the employees knew the coverplate could become loose and protrude, and eventually added a screw to prevent this condition, did not amount to actual knowledge. 210 S.W.3d at 603–04. Nor will the fact that an extension cord can be taped down and that alternative methods of stringing were discussed amount to actual knowledge that the cord's position at the time of the accident created a dangerous condition. The evidence does not create a material fact issue on actual knowledge.

The dissent identifies the dangerous condition as the cord having been laid without being secured to the ground or the retaining wall. Distinguishing cases discussed above, the dissent argues that the dangerous condition here did not develop over time or result from "ordinary wear and tear." ___ S.W.3d. at ___. The dissent distinguishes the defect in *City of Denton v. Paper* from the defect here by asserting that "no evidence indicated that the City actually knew of subsequent settling or sinking" in *Paper*, whereas the defect here did not develop over time. *Id.* at ___ (citing 376 S.W.3d at 767). This, however, presumes facts not in the record. There is no evidence of how the cord was

initially laid; in fact, the only evidence of the cord's position is from Professor Sampson when recounting the injury he suffered.[4] Therefore, we do not know how the cord was initially placed—if UT even knew, it may have believed it to be secure and not presenting a tripping hazard. The dissent also discusses *City of Dallas v. Thompson*, explaining that the City was only aware that the coverplate *may* become loose and protrude, not that it *was* loose and protruding. *Id.* at ___ (citing 210 S.W.3d at 603–04). However, the unsecured coverplate in *Thompson* is no different from the unsecured extension cord here—while UT may have known the extension cord was capable of being pulled off of the ground, this amounts to constructive knowledge, which is not the same as actual knowledge of a dangerous condition. "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time." *Stewart*, 249 S.W.3d at 414–15.

From the record, the most we can conclude is either that UT had constructive knowledge of a dangerous condition or that UT had actual knowledge of a potential danger. Neither satisfies the standard here: "Actual knowledge rather than constructive knowledge of the dangerous condition is required." *Tennison*, 509 S.W.2d at 562. UT must have actually known of the dangerous position of the cord "at the time of the accident, not merely of the possibility that a dangerous condition

---

[4] Sampson described the cord as coming down through the ivy on the concrete retaining wall, at an angle and unsecured to either the retaining wall or the ground. Because it crossed the walkway at an angle, it caught Sampson's shin.

c[ould] develop over time." *Hayes*, 327 S.W.3d at 117 (alteration in original) (quoting *Stewart*, 249 S.W.3d at 413–14). There is no evidence that UT had such actual knowledge.

## V. Conclusion

Sampson's claim is properly characterized as a premises defect claim, and there is no evidence that UT had actual knowledge of the tripping hazard created by the cord's position over the retaining wall and across the sidewalk. We therefore affirm the judgment of the court of appeals, which dismissed Sampson's claim against UT for lack of jurisdiction.

_____
Paul W. Green
Justice

OPINION DELIVERED: June 10, 2016