COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| THE CITY OF ELPASO, | § | |
| | | No. 08-19-00163-CV |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 171st District Court |
| JOANNA CANGIALOSI, | § | |
| INDIVIDUALLY, AND AS NEXT OF | | of El Paso County, Texas |
| FRIEND OF C.C., A MINOR CHILD, | § | |
| SURVIVING DAUGHTER AND AS | | (TC#2018DCV0797) |
| HEIR TO THE ESTATE OF ANNETTE | § | |
| MARTINEZ; JOSE AGUILAR; | | |
| RAYMOND AGUILAR; FIDEL | § | |
| AGUILAR; ERIC AGUILAR, | | |
| INDIVIDUALLY AND AS SURVIVING | § | |
| SONS AND HEIRS TO THE ESTATE | | |
| OF ANNETTE MARTINEZ, | § | |
| | | |
| Appellees. | § | |

## **O P I N I O N**

This is an interlocutory appeal from the denial of a plea to the jurisdiction. In the underlying lawsuit, the victims of a traffic collision brought a negligence claim against the City of El Paso alleging that the police improperly conducted a vehicular pursuit of two suspected house burglars. While fleeing the scene of the crime, the culprits caused a multi-vehicle pile-up that took the life of Annette Martinez and injured her daughter and granddaughter. The parties join

issue on whether police actually pursued the suspects, and if so, whether the suspects were aware of a police pursuit. These factual issues are germane to the jurisdictional question of whether the police were negligent in the use of a motor vehicle, and whether the death and injuries arose from that use. For the reasons discussed below, we affirm the trial court's denial of the plea to the jurisdiction.

## I. BACKGROUND

On March 4, 2016, Joanna Cangialosi was approaching a red stop light in a southbound lane of Stanton Street at its intersection with Schuster Avenue. Also in the car were her six-month old daughter, and Cangialosi's mother, Annette Martinez. There was one vehicle ahead of her that was at a complete stop. A vehicle driven by Aaron Roacho approached Cangialosi's car from the rear at a high rate of speed, failed to stop, and struck Cangialosi's vehicle with enough force to drive it into two other vehicles. The impact killed Annette Martinez, and according to the allegations below, injured Cangialosi and her six-month old daughter. Cangialosi, both individually and in her representative capacity, along with other wrongful death beneficiaries[1] (hereinafter Appellees), brought suit against the City.

### A. The allegations

The parties hotly contest the basis for the City's potential liability for the collision. Appellees' Original Petition makes these claims: On the day of the accident several El Paso police officers were conducting surveillance in a residential neighborhood to investigate a spate of recent house burglaries. The officers saw two youths, Aaron Roacho and Jacob Sanchez, in a white 1997 Acura back out of a driveway and drive west on Robinson Avenue. Officer Nicholas

---

[1] Jose Aguilar, Raymond Aguilar, Fidel Aguilar, and Eric Aguilar joined the suit both individually and as surviving sons and heirs to the estate of Annette Martinez.

2

Villalobos began to follow them in an unmarked police unit. Appellees allege that the teenage suspects then realized they were being followed and increased their speed to avoid apprehension. They turned onto Stanton Street heading south, while Officer Villalobos was in pursuit at a high rate of speed. He did not engage any emergency lights or siren, and soon six other El Paso police vehicles joined the pursuit. Appellees allege that only one of those units was a marked police unit that had its lights and siren engaged.

As Roacho's vehicle approached the intersection of Stanton Street and Schuster Avenue, it struck the rear of Cangialosi's vehicle. Officer Villalobos was also unable to stop, and his unmarked unit struck another car from the rear (but not Cangialosi's car). The petition alleges that the manner in which the officers conducted the pursuit proximately caused the collision. They complain that the officers violated department policy in that: (1) the suspects did not present a clear and immediate threat to the public so as to require a vehicular pursuit in the first place; (2) if there was a need to pursue the suspects, six of the seven pursuing vehicles had not turned on their lights and sirens as required by department policy; (3) an excessive number of units were engaged in the pursuit; and (4) they did so along a congested street when it was not safe to pursue the suspects.

### B. The City's Plea to the Jurisdiction

The City challenged the trial court's jurisdiction claiming in an amended plea to the jurisdiction that several of Appellees' pleaded allegations were factually unsupportable. In particular, the City contested whether the officers were in pursuit of Roacho. Officer Villalobos, who was in the police vehicle closest to Roacho's testified as follows:

> Q. Can--can we agree that at the time of that collision, you were attempting to apprehend Aaron Roacho?
>
> A. No, sir.

3

Q.      What was the purpose of you following Aaron Roacho?

A.      I was following him in order for the marked unit to conduct a traffic stop.

Q.      So you were--you were not attempting to apprehend Aaron Roacho on that day?

A.      No, sir.

Q.      At any point on that day--at any point did you attempt to apprehend Aaron Roacho?

A.      No, sir.

Q.      You said your purpose was to follow him?

A.      Yes, sir.

Q.      And what was the purpose of you following him?

A.      I was attempting to follow him so I can get a marked unit to conduct a traffic stop. We were investigating a burglary of habitation, and we needed to get a traffic stop in order to further investigate it.

And more particularly, the City presented the transcript of an interrogation of Aaron Roacho. The police interviewed Roacho three days after the collision. By that time, he had already been arrested for burglary of a habitation. After being informed of his *Miranda* rights, Roacho admitted he was the "driver for the burglary." His friend "Jayden" went inside the house, and Roacho was acting as look-out. When he saw a red truck pull up (it looked "like a Jeep"), he alerted Jayden who came out of the house. Roacho then described what happened next:

Q.      He comes out of the house with what?

A.      With bags and two--with a bag--with a bag and two shotguns.

Q.      Okay. And where does he put them?

A.      He--he goes to the other seat where I was driving, puts them in the back. I get in the car. I started driving. And Jayden--Jayden starts telling me that they were going to call the cops. So I started really getting panicked, and I just--

Q.      So you guys saw no cops?

4

A.    No.

Q.    Just you guys--only the red Jeep?

A.    Yes.

Q.    Okay.   So you panicked because you thought that the red Jeep was going to do what?

A.    Follow us.

Q.    Follow you.   Did it follow you?

A.    Yes.

Q.    The red Jeep followed you?

A.    Yes.

Q.    Okay.   So it's following you, and that makes you go fast.   On what streets?

A.    No.   When I had left the house, the red Jeep stayed there--

Q.    Okay.

A.    --and they left.

Q.    Okay.

A.    They didn't follow me as I was driving.

Q.    Okay.

A.    I left and the red Jeep stayed there.

Q.    Okay.

A.    So I come down Stanton, down the hills, and I'm driving, and I was really panicked because I was already on probation,[2] and I'm driving.   And, shit, boom, I hit the car.

Q.    Oh, so nobody is following you.   You just panicked.

A.    Yes.   I was panicked.

Later in the interrogation, Roacho continued to deny that anyone was pursuing him:

---

[2] Roacho had been found guilty and placed on probation for a different burglary charge just ten days before this break-in.

5

Q. Okay. So then, once you get in your car, you realize that the red Jeep is not following you?

A. I didn't look back.

Q. Oh, you didn't look back. So nobody is following you as far as you're concerned?

A. Nobody is following me.

Q. Okay. And--but you're panicked because you're on probation for this?

A. Yes.

. . .

Q. Okay. So you guys were--were leaving the burglary, right?

A. Yeah.

Q. And you were panicked, and that's why you were driving so fast

A. Yes.

Q. --is that correct?

A. Yes.

Q. Okay. You were trying to get away?

A. No. I wasn't trying to get away because nobody was following me.

Q. Nobody was following you, okay. You just panicked.

A. Yes. I was just panicked. I just crashed.

**C. Appellees' response**

Appellees' response to the City's plea includes a number of exhibits that add significant detail to the events of March 4, 2016.

A number of police officers were working undercover in the Kern neighborhood that day looking for the person or persons responsible for a series of recent break-ins. Those officers were in unmarked police vehicles. But nearby, Officer Humberto Herrera was parked in a marked police unit. He was running checks on any suspicious license plates and was the designated "take

6

down" officer. When an undercover officer witnesses conduct that might give the police reasonable suspicion of a crime, that officer can direct a marked police unit to conduct a traffic stop (assuming some probable cause for an actual traffic violation) at which time additional inquiry of the suspect might take place.

Officer Villalobos spotted the two youths driving a white Acura in a manner consistent with casing houses. Officer Villalobos, who was driving a gray Ford Focus, followed them for a time but discontinued the surveillance when he thought he was spotted.[3] He relayed the vehicle's license plate number to Officer Herrera who ran a search on the plates. The search indicated the vehicle was registered to an address in another part of town, and that the same vehicle was involved in a burglary of a habitation the day before. Officer Villalobos again spotted the vehicle, now pulled into the driveway of a house on Robinson street. Officer Villalobos parked five houses away and alerted the other undercover officers who took up positions around the house. Officer Villalobos noticed a red Jeep Grand Cherokee parked by the Acura. One of the undercover officers saw the youths hurriedly exiting the house carrying duffel bags. They got in the Acura and left traveling west on Robinson at a high rate of speed.

The suspects passed by Officer Villalobos's car which was also parked on Robinson. He then followed the Acura as it turned southbound on Stanton. Officer Villalobos was on the radio calling out to the other units the Acura's position and direction of travel.[4] Another undercover

---

[3] He had told one officer he was spotted, but later clarified that was not the case.

[4] A police audio file with time stamps reflects the following dialogue:
> 13:31:09 (Miguel Acuna #2396): Hey be ready to stop them eh, Humberto. They had some property. They were in a rush, in a hurry to get out of there. They're going down towards Stanton, Robinson or Stanton. Let me give you some PC [probable cause] real quick. Oh they're going too fast, go get em.
> 13:31:25 (Miguel Pacheco #2220): Yeah, uh, Villalobos is right behind them right now. They are picking it up.
> 13:31:31 (Nick Villalobos #2849): Hey Bert we're here by the fire station.
> 13:31:35 (Miguel Acuna #2396): Let's stay off the radio everybody. Nick you call it out. Nick call it out.

officer stated in the radio chatter "Villalobos is right behind them right now. They are picking it up." Villalobos stated that the white Acura was going at a high rate of speed and gaining distance from him. In turn, Officer Villalobos accelerated to try and keep up and he was not aware of his speed. In Officer Villalobos's words: "I was following him, he was driving fast and I was just trying to see which way he would go because we already had a marked unit on the way. I was not directly behind him; I was maybe a block behind him." He lost sight of the white Acura for "a few seconds" as it crowned over a hill and when he regained visual, he saw the impact of the initial accident. Officer Villalobos then collided with another vehicle that stopped just short of the first collision.

A map attached to Appellees' response adds some perspective. Roacho would have traveled down two to three short residential blocks on Robinson before turning left on Stanton. Once on Stanton, he would have then traveled south for eight blocks to the point of collision. In the last several blocks, a driver on Stanton crests a small hill before heading down towards the Schuster intersection. The hill is high enough that a driver on Stanton cannot see the Schuster intersection until the very last block when they crest the hill.

The other significant player in these events was Officer Herrera. His unit was equipped with a dash-board camera that captured (with time stamps) the front view from his unit. Our record includes the video from when he was called to "take down" the Acura until his arrival at the accident scene. The video shows that he turned onto Robinson at time stamp 14:31:21 and

---

13:31:41 (Nick Villalobos #2849): Hey we're going, uh, south on Stanton. He's picking it up. South on Stanton passing, uh, University.
13:31:58 (Nick Villalobos #2849): He's coming up to University passing on Stanton.
13:32:05 (Nick Villalobos #2849): He's taking off. Still south on Stanton coming up to Rim.
13:32:14 (Humberto Herrera #2906): Trying to catch up.
13:32:17 (Nick Villalobos #2849): He lost it! He 81'd! [code for accident]
13:32:24 (Nick Villalobos #2849): I just 81'd!

accelerated until he reached Stanton at 14:31:48. While on Stanton, his siren is first heard at 14:31:53 and smoke can be seen rising over the crest of the street when he is about one and a half blocks from the accident scene. The time stamp at that point is 14:32:20 and he came to a stop at the accident scene at 14:32:30. The time stamps suggest that one minute and ten seconds elapsed from the time he turned onto Robinson until he arrived at the accident site. Thirty-two seconds lapse from the time he turned on to Stanton, until smoke from the accident is visible on the video.[5] From the video, it is not possible to distinctly visualize the white Acura or Officer Villalobos's vehicle when Officer Herrera turned onto Stanton. In Officer Herrera's written statement, he opined that he "noticed a white vehicle in the distance, very far away" but did not know if it was the white Acura or not. An internal police document that apparently tracks marked police units shows that Officer Herrera's speed over the last six blocks before the accident site was more than 50 mph, with the highest speed notched at 72 mph.

A police traffic investigation specialist determined from the skid marks at the scene that Roacho was traveling a minimum of 57 mph just prior to applying his brakes. The same traffic investigator determined that Officer Villalobos was driving a minimum speed of 60 mph just prior to breaking. The speed limit is 30 mph along that part of the Stanton.

Appellees response also documents that the police department brought disciplinary charges against both Officer Villalobos and Officer Herrera for events arising out of the accident. As to Officer Villalobos, the department sustained the charge of "violation of safety practices-excessive speed (60/30) and preventable accident." All other charged against Officer Villalobos and Officer Herrera were either classified as "unfounded" or as "exonerated."

The trial court denied the City's plea to the jurisdiction, and this appeal follows.

---

[5] We note that as Officer Herrera was accelerating to catch up to the Acura, with his lights and siren engaged, very few drivers on the moderately busy roadway pulled over to the right as required by state law. Accordingly, Officer Herrera was required to weave in and out of traffic.

9

## II. PLEA TO THE JURISDICTION

Sovereign immunity (from suit) implicates a trial court's subject matter jurisdiction unless the State expressly consents to suit. *Engelman Irrigation Dist. v. Shields Brothers, Inc.*, 514 S.W.3d 746, 751 (Tex. 2017). Governmental immunity operates like sovereign immunity and affords similar protection to subdivisions of the State, including its cities for governmental functions. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009). Police protection is a governmental function. TEX.CIV.PRAC. & REM.CODE ANN. § 101.0215(a)(1). Accordingly, the City of El Paso is entitled to immunity from lawsuits seeking monetary damages unless its immunity is waived. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011).

The legislature has provided a limited waiver of governmental immunity in the Texas Tort Claims Act (TTCA). TEX.CIV.PRAC. & REM.CODE ANN. § 101.021. The TTCA waives sovereign immunity in "three areas when the statutory requirements are met: (1) use of publicly owned automobiles; (2) injuries arising out of a condition or use of tangible personal property; and (3) premises defects." *Sampson* v. *Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016); TEX.CIV.PRAC. & REM.CODE ANN. §§ 101.021, 101.022. As we explain below, the only waiver at issue here relates to the police use of a motor vehicle.

A governmental entity may challenge whether the plaintiff raises a TTCA exception to governmental immunity through a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). The plea may challenge the sufficiency of the pleadings, or it might also include jurisdictional evidence which thereby places into issue the existence of jurisdictional facts. *Id.*; *Univ. of Texas at El Paso v. Ochoa*, 410 S.W.3d 327, 330 (Tex.App.--El Paso 2013, pet. denied).

As here, when a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties. *Miranda*, 133 S.W.3d at 226. "If there is

no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law." *Heinrich*, 284 S.W.3d at 378. "If, however, the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder." *Id.* "This standard mirrors our review of summary judgments" where the reviewing court takes as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Id.* As the *Miranda* court explained, "[b]y requiring the [governmental entity] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to 'put on their case simply to establish jurisdiction.'" *Miranda*, 133 S.W.3d at 228, *quoting Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). This procedure also allows the governmental entity to "extricate itself from litigation if it is truly immune" at an early stage in the proceedings before the entity has been required to incur the full costs of litigation. *Miranda*, 133 S.W.3d at 228. If there is no fact question on the jurisdictional issue, the trial court should rule on the plea to the jurisdiction as a matter of law. *Heinrich*, 284 S.W.3d at 378.[6]

We review de novo the question of whether a plaintiff has alleged facts sufficient to affirmatively demonstrate a trial court's subject matter jurisdiction, and whether the jurisdictional facts establish a trial court's jurisdiction (or lack thereof). *Miranda*, 133 S.W.3d at 226-27; *Tabrizi v. City of Austin*, 551 S.W.3d 290, 295-96 (Tex.App.--El Paso 2018, no pet.); *see also*

---

[6] This court has previously stated that a "no evidence" motion for summary judgment cannot be used to challenge jurisdiction. *See City of El Paso v. Collins*, 483 S.W.3d 742, 755 (Tex.App.--El Paso 2016, no pet.). The Texas Supreme Court, however, has recently held just the opposite. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551 (Tex. 2019) ("Because jurisdiction may be challenged on evidentiary grounds and the burden to establish jurisdiction, including waiver of a government defendant's immunity from suit, is on the plaintiff, we see no reason to allow jurisdictional challenges via traditional motions for summary judgment but to foreclose such challenges via no-evidence motions."). The *Swanson* court, however, noted that the other procedural protections for no evidence motions--such as the requirement that they can only be asserted after an adequate time for discovery--will protect the non-movant. *Id.* The plea to the jurisdiction in this case often states that Appellees have "no evidence" to support their various claims. Nonetheless, we do not treat the motion as a true Rule 166a(i) motion for summary judgment because it was not expressly filed as such.

*Texas Tech Univ. Health Sciences-El Paso v. Flores*, 587 S.W.3d 831, 837 (Tex.App.--El Paso 2019, pet. filed) ("In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor[,]" though "we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not.").

## III. DISCUSSION

The City advances a single issue, broken down into two distinct arguments, to claim that the trial court erred in failing to grant its plea to the jurisdiction. First, the City maintains that the jurisdictional evidence shows the police were not pursuing Roacho at the time of the collision, thus they could not have violated the City's pursuit policy. The import of this argument is that the City was not negligent in the operation of any motor vehicle. Second, the City contends that if there was a pursuit, Roacho never realized that fact, which precludes any nexus between the police use of a motor vehicle and the resulting injuries. The City also contends that even assuming that Roacho was aware of a police pursuit, the police did no more than furnish the condition that made the accident possible. As such, the police conduct is too attenuated to be a cause of Appellees injuries. We take these arguments in turn.

### A. Was there a pursuit?

The City first contends that because there was no evidence of an actual pursuit, the allegations that the officers violated the "pursuit policy" necessarily fail. Appellees are required to show the negligent use of a motor vehicle as a predicate to their suit. *See Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 928 (Tex. 2015) ("[T]here is no immunity waiver absent the negligent or otherwise improper use of a motor-driven vehicle."). And the City claims the negligence claim turns on violations of the department policy. Appellees contend that

12

the evidence supports a negligence claim outside of department policy, but we need not reach that issue, because Appellees have raised some evidence that there was a pursuit, and that its manner violated department policy.

The El Paso Police Department's policy defines a pursuit as "an active attempt by one or more Officers to apprehend a suspect operating a motor vehicle who is attempting to evade arrest." Officer Villalobos, in responding to a post-accident internal affairs investigation, stated that he was exceeding the speed limit because he "witnessed a burglary of habitation which is a violent offense. . . . Knowing that the suspect vehicle had committed a burglary of habitation a day prior and also stolen a vehicle, these subjects were on a city wide crime spree." The City here claims Officer Villalobos was following Roacho's white Acura for the express purpose of assisting Officer Herrera who was going to pull the vehicle over for a traffic violation. Once pulled over, the police could then further investigate the burglary. But given that officers had witnessed an apparent break-in by the two, there is at least some evidence the police intended to apprehend the suspects. That is, they already had all the probable cause they needed to effect an arrest. And Roacho, by his own admission, was speeding away from the house because he thought a person in a red Jeep was going to call the police. Roacho was already on probation for burglary. Hence, there is some evidence that (1) the police were attempting to apprehend a suspect operating a motor vehicle, who (2) was evading arrest.[7]

Moreover, the record contains at least some evidence of a violation of department policy. That policy requires that "Both audible (siren) and visual (emergency lights) emergency warning equipment will be used when engaged in a vehicular pursuit." Officer Villalobos did not have

---

[7] We address below the evidence germane to whether Roacho appreciated that he was being followed just prior to the accident, which also bears on whether he was evading arrest.

13

either lights or a siren in his vehicle, and thus did not use either lights or a siren.[8]  He was in fact driving an unmarked police car which should not "participate in vehicular pursuits except in extreme, life threatening situations."  Policy also requires that any unit involved "will proceed in a safe manner and only at reasonably safe speeds, depending on the time of day, weather and road conditions, and amount of traffic."  A jury could conclude that driving either 60 mph as did Officer Villalobos, or 72 mph as did Officer Herrera on Stanton, was not a reasonably safe speed for the circumstances.  Another undercover officer testified that a speed in excess of 30 mph would "to some degree" not be a "safe speed" because "there's a lot of traffic on the roadway." That would be particularly true of Officer Villalobos as he crested the crown of the hill on Stanton just before the Schuster intersection.  His view of the intersection was restricted at that point which in fact lead to his own collision with another vehicle.

Negligence is the breach of a legal duty.  *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).   The Texas Supreme Court has agreed that a "peace officer's flawed execution of policy gives rise to a colorable negligence claim."  *Ryder*, 453 S.W.3d at 928, *citing State v. Terrell*, 588 S.W.2d 784, 788 (Tex. 1979) ("[I]f . . . an officer or employee acts negligently in carrying out that policy, government liability may exist . . . .").  We express no opinion on whether this evidence actually establishes negligence.   Instead, we hold only that the evidence is sufficient to overcome the plea to the jurisdiction vis-à-vis the negligent operation of a motor vehicle.

### B.  Did the injuries arise from the operation or use of a motor vehicle?

Relevant here, section 101.021(1)(A) of the TTCA precludes the City's liability, unless the injury or death "*arises from* the operation or use of a motor-driven vehicle."  TEX.CIV.PRAC. &

---

[8]  The City has not raised a "non-use" argument, and we do not decide whether the failure to use lights or a siren would by itself be actionable.  *See Texas Nat. Res. Conservation Comm'n. v. White*, 46 S.W.3d 864, 870 (Tex. 2001) (non-use of pump did establish claim under use of motor-driven equipment exception to governmental immunity).

14

REM.CODE ANN. § 101.021(1)(A) (emphasis supplied). While there is no statutory definition of "arises from" in the TTCA, it at least "requires a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle[.]" *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51 (Tex. 1992), *quoted approvingly in PHI, Inc. v. Texas Juvenile Justice Dep't*, 593 S.W.3d 296, 302 (Tex. 2019). The nexus "requires more than mere involvement of property." *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 543 (Tex. 2003). Rather, the use or operation "must have actually caused the injury." *Tex. Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex. 2001).

The "actually caused the injury" requirement has been analyzed as "but-for" causation. *See Ryder*, 453 S.W.3d at 929 ("Cause in fact is essentially but-for causation."). "In other words, a tortious act is a cause in fact if [it] serves as 'a substantial factor in causing the injury and without which the injury would not have occurred.' " *Id.*, *quoting Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

### 1. Was Roacho aware of the pursuit?

The City first relies on Roacho's statement that he was not aware that any vehicle was following him. Rather, he sped away from the crime scene because he thought someone had pulled up in a Jeep who was going to call the police. If true, none of the subsequent police actions could be the cause in fact of Roacho speeding down Stanton street and striking Appellees car.

Appellees respond to this argument in several ways. First, Appellees note that Roacho's statement is self-serving, because he had a motive to portray the collision as an accident, and not as his flight from the police, which might constitute a separate criminal offense. *See* TEX.PENAL CODE ANN. § 38.04 (a)(3) ("A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him" and which is a second degree felony when another suffers death as a direct result of the

15

flight).   And borrowing from Rule 166a(c), a "summary judgment may be based on uncontroverted testimonial evidence of an interested witness" so long as it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted."  TEX.R.CIV.P. 166a(c); *see also Miranda*, 133 S.W.3d at 226 (noting plea to jurisdiction standard mirrors review of summary judgments).   In that regard, Appellees claim that the interview, which is also before us, is not credible because the detective largely asked leading questions on the critical questions.

Appellees also counter Roacho's statement with other evidence that they contend creates a fact question on whether he appreciated the pursuit:   (1) Officer Villalobos stated that he had earlier been spotted by Roacho while in the Kern neighborhood and thus Roacho would have recognized his car;[9]   (2) one undercover officer stated on the radio after Roacho left the house that "Villalobos is right behind them right now. They are picking it up" suggesting the vehicles were close to each other;   (3) that Roacho was picking up speed once he was on Stanton and well away from the crime scene, suggesting that he knew he was being followed; (4) both Officer Herrera and Officer Villalobos were driving in a very conspicuous manner--straddling the lane lines at a high rate of speed--which would be obvious to Roacho; (5) Officer Villalobos crashed very soon after Roacho did, suggesting he was very close behind; and (6) Officer Herrera's lights would have been visible all the way down Stanton, except for the last half block prior to the crash scene.   The City's reply brief does not address any of these specific arguments.   It is not our role to divine responses to well-articulated and facially plausible arguments.   We conclude that Appellees have at least raised a fact issue as to whether Roacho appreciated that the police were in pursuit at the time of the crash.

_____

[9] On the radio, and before Roacho broke into the house on Robinson, Officer Villalobos told his fellow officers that "They started weaving in and out once they spotted me." Officer Villalobos later claimed this only meant that he was driving the only other car on the road when he passed Roacho.

16

## 2. *Even assuming he was aware, is the nexus requirement met?*

In its reply brief, the City does argue that even assuming that Roacho was aware of a pursuit, Appellees still cannot show a nexus between the police use of its vehicles and the accident.[10]   In that regard, the City points out that no police unit impacted Roacho's or Appellees' vehicles.   The police never bumped, nudged, or redirected Roacho, and at most they followed him from a distance.   The City focuses on the Texas Supreme Court's prior statement that under the TTCA, "[p]roperty does not cause injury if it does no more than furnish the condition that makes the injury possible."   *Dallas Cty. Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998); *see also Dallas Area Rapid Transit*, 104 S.W.3d at 543 (restating same). Here, the City contends that the police pursuit did no more than furnish the condition that allowed Roacho to cause the injury producing collision.

In this regard, the City relies on the Dallas Court of Appeals decision in *City of Dallas v. Hillis*, 308 S.W.3d 526, 534 (Tex.App.--Dallas 2010, pet. denied).   In that case, a police officer witnessed a motorcyclist commit a traffic offense and tried to initiate a stop by turning on his lights and siren.   The motorcyclist declined to stop and instead accelerated to over 110 mph as the officer tried to give chase on an expressway.   A passenger on the motorcycle turned to look at the pursuing officer.   Upon entering an exit ramp, the motorcyclist lost control and crashed, killing both himself and his passenger.   A subsequent negligence suit alleged that the officer violated policy in attempting to pursue the fleeing cyclist.   In sustaining a plea to the jurisdiction, the court

---

[10] At oral argument, Appellees contended that because this argument was new, we cannot consider it.   A Dallas Court of Appeals decision would support that view.   *Dallas County Hosp. Dist. v. Hospira Worldwide, Inc.*, 400 S.W.3d 182, 185 n.2 (Tex.App.--Dallas 2013, no pet.).   But the Texas Supreme Court has held that sovereign immunity implicates a trial court's jurisdiction and cannot be waived, so we reach the merits of the argument, particularly because Appellees do not contend they could have included additional facts in the record below that bear on this species of the City's argument.   *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012) (argument raised for first time to court of appeals); *Manbeck v. Austin Indep. Sch. Dist.*, 381 S.W.3d 528, 530 (Tex. 2012) (immunity argument raised for first time before Texas Supreme Court).

reasoned that the use of a patrol car in a high-speed pursuit was too attenuated from the suspect's own conduct to constitute a cause of the crash. *Id.* As the court explained, "[i]n our view, . . . the only actual cause of Hillis's accident was his own decision to attempt to exit eastbound Interstate 635 at a reckless rate of speed. At most, Perez's use of his police car only furnished the condition that made Hillis's accident possible." *Id.*; *see also Teague v. City of Dallas*, 344 S.W.3d 434, 436 (Tex.App.--Dallas 2011, pet. denied) (affirming plea to the jurisdiction based on extended chase that ended when suspect "suddenly swerved his vehicle and cut across three lanes of traffic" at 80 mph which injured passenger in car).

The Houston First followed *Hillis*'s reasoning, in a comparable but not identical fact situation. *See Williams v. City of Baytown*, 467 S.W.3d 566, 577 (Tex.App.--Houston [1st Dist.] 2015, no pet.). In that case, police officers attempted to box-in fleeing suspects with their police units in a parking lot. The suspects escaped and following a pursuit, later crashed into and killed an innocent motorist. Analyzing the several cases in this area, Justice Bland writing for the court concluded that the boxing-in move was "too attenuated from Chauncey's decision to evade the officers and continue his reckless flight. As a result, the officers' failed strategy was not a proximate cause of the accident." *Id.* at 577. Justice Bland identified and distinguished those cases that had found a nexus, noting each involved some distinct action of the police vehicle that made it a co-tortfeasor.

Chief among those cases is *Ryder*, where the Texas Supreme Court found the lower court erred in granting a plea to the jurisdiction. In that case, a sheriff's deputy pulled over a semi-truck for a traffic violation. 453 S.W.3d at 926. The deputy placed his cruiser on the shoulder of the road alongside the stopped truck, but in a position facing on-coming traffic with both its headlights and emergency flashers engaged. *Id.* Another truck driver traveling in the same direction, allegedly hindered by the lights of the police cruiser, struck the stopped truck, killing the second

18

driver.   The *Ryder* court found the pleading sufficient to allege that the use of the police vehicle was a cause in fact of the accident.   "[B]y directing the cruiser's lights toward eastbound traffic, [the deputy] caused Solis's errant driving.   *Ryder* thus contends that the collision—and any associated harm—would not have occurred absent [the deputy's] decision to drive his car toward oncoming traffic."   *Id.* at 929;   *see also City of San Antonio v. Johnson*, 103 S.W.3d 639, 642 (Tex.App.--San Antonio 2003, pet. denied) (police officer's alleged negligence in making illegal U-turn in police cruiser potentially causing the traffic accident).

More recently, the Fourth Court of Appeals took a different view in a case where an officer-initiated pursuit ended with a fatal crash.   *Maspero v. City of San Antonio*, No. 04-18-00286-CV, 2019 WL 4044036, at *3 (Tex.App.--San Antonio Aug. 28, 2019, pet. filed) (mem. op., not designated for publication).[11]   In *Maspero*, the police officer tried to initiate a traffic stop of a vehicle suspected of carrying narcotics.   The officer signaled the vehicle to stop, but it fled, leading to a high-speed chase that ended when the suspect spun out at an intersection.   As the police officer pulled her unit towards the suspect's vehicle, the suspect suddenly drove towards and barely missed the officer's unit.   Unfortunately, it crashed head-on into another passing motorist, killing two occupants and injuring several others.   The court of appeals overturned a granted plea to the jurisdiction by finding there was a sufficient nexus between the officer's use of her vehicle and the collision.   The court identified several factors developed in the Texas Supreme Court's *Ryder* case and concluded those factors were all met.[12]   It also relied on the police

---

[11] Chief Justice Marion filed a dissent to the denial of the motion for reconsideration en banc based on her belief that the panel decision conflicted with an earlier decision of the same court of appeals.  *See Maspero v. City of San Antonio*, 590 S.W.3d 639 (Tex.App.--San Antonio 2019) (Marion, C.J., dissenting from denial of reconsideration en banc) *citing Lopez v. Escobar*, No. 04-13-00151-CV, 2013 WL 4679062, at *1 (Tex.App.--San Antonio Aug. 28, 2013, no pet.) (mem. op., not designated for publication).

[12] The attenuation factors include: (1) whether the government employee was actively operating the vehicle at the time of the incident, (2) was the vehicle being used as a motor vehicle and not something else, such as a holding cell, (3) did the alleged tortious act relate to the operation of the vehicle rather than to some other aspect of the defendant's conduct, and (4) whether the alleged cause is geographically, temporally, or causally attenuated from the alleged effect

department's accident report that listed "fleeing or evading police" as some evidence supporting the cause-in-fact requirement.

Ultimately, the key to reconciling these cases is to identify the causative factor of the accident and determine if it is related to the police's use of a motor vehicle. In *Hillis*, for instance, the immediate cause of the accident was the fleeing suspect's decision to take an exit at too great a speed. *Hillis*, 308 S.W.3d at 534. The pursuing officer had nothing to do with causing the suspect to take the exit. Accordingly, the pursuit itself only furnished the condition making the fatal decision to exit the freeway possible. Likewise, in *Williams* the cause of the accident was the fleeing suspect running over tire spikes and then rear-ending a parked car. *Williams*, 467 S.W.3d at 577. That action was far attenuated from the earlier action of trying to box-in the suspect at an entirely different location. Conversely, in *Ryder* one possible accident causing event was the sheriff directing headlights into on-coming traffic. *Ryder*, 453 S.W.3d at 926. Because the sheriff was responsible for parking his vehicle in that position, immunity was waived.

Based on Roacho's statement, the causative factor of the accident here was his coming over the crest of the hill on Stanton at too high a rate of speed. Once on the downslope, he arguably did not have time to stop before impacting Appellees' car. A causative factor of the accident was his speed on a moderately busy street. And the pursuit by the police in their vehicles is the act that is *alleged* to have caused Roacho to speed, as he fled to get away. In this case, it was the pursuit itself that lead to the speed, which was the claimed cause of the accident. And as some of Appellees' proofs suggest, the pursuit was by unmarked vehicles which might have only accentuated the panic which Roacho claims drove his decision to flee.

---

such that the alleged cause did no more than furnish the condition that made the effect possible. *Ryder*, 453 S.W.3d at 928.

20

The City essentially argues for a bright-line rule for police pursuit cases, such that if the officer's vehicle is not involved in the impact, and does not nudge, re-direct, or bump the fleeing suspect so as to contribute to the accident, immunity should bar the suit. While that bright-line rule may have much to offer from the standpoint of the public fisc, or clarity in police pursuit tactics, no court has clearly articulated it as such in police pursuit cases. It is not for an intermediate court of appeals to do so here. Instead, we are cognizant of the Texas Supreme Court's more recent counsel that "[w]hile the multiplicity of possible fact-patterns and the vagaries of litigation can create complexity, in general courts should strive to give simple words like 'operation' and 'use' a simple construction, rather than converting them into terms of art intelligible only to experts in the case law applying the Tort Claims Act." *PHI, Inc.*, 593 S.W.3d at 303. The same could likely be said for the "arises from" language in the same statute. We agree with Appellees that they have raised sufficient facts to show some nexus between the police use of a vehicle and the accident to defeat the plea to the jurisdiction.

## IV. CONCLUSION

We overrule the City's single issue and remand the case to the trial court. In doing so, we note that at this stage of the litigation the Appellees have at least cleared the hurdle required for creating a fact issue on the distinct requirements of the TTCA. In a plea to the jurisdiction, a plaintiff is not required to "put on their case simply to establish jurisdiction." *Bland*, 34 S.W.3d at 554. For that reason, a proper jurisdictional analysis should "not involve a significant inquiry into the substance of the claims." *Ryder*, 453 S.W.3d at 928, *quoting Bland*, 34 S.W.3d at 554. And we have not undertaken that level of review here, nor do we express any opinion on the City's actual culpability, if any.

21

JEFF ALLEY, Chief Justice

August 31, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.