**Opinion issued July 22, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-20-00679-CV**

————————————

**THE UNIVERSITY OF TEXAS MD ANDERSON CANCER CENTER,**
**Appellant**

**V.**

**COURTNEY SIMPSON, Appellee**

———

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-51087**

———

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, The University of Texas MD

Anderson Cancer Center ("MD Anderson"), challenges the trial court's order

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8).

denying its plea to the jurisdiction filed in the suit brought against it by appellee, Courtney Simpson, for premises liability. In its sole issue, MD Anderson contends that the trial court lacks subject-matter jurisdiction over Simpson's suit.

We reverse and render.

## Background

In her petition, Simpson alleged that on December 15, 2016, she was a visitor at MD Anderson. While at MD Anderson, Simpson slipped and fell "due to a wet and slippery floor." According to Simpson, her fall and resulting injuries were proximately caused by the negligence of MD Anderson, and MD Anderson had actual knowledge of the condition that caused her fall. Simpson brought a premises liability claim against MD Anderson and sought damages for medical expenses, physical pain, mental anguish, physical impairment, disfigurement, and loss of earning capacity.

MD Anderson answered, generally denying the allegations in Simpson's petition and asserting that the trial court lacks jurisdiction because MD Anderson "is entitled to full sovereign immunity" and the Texas Tort Claims Act ("TTCA") did not waive that immunity.[2]

---

[2] *See id.* §§ 101.001–.109

In its plea to the jurisdiction,[3] MD Anderson asserted that the trial court lacks subject-matter jurisdiction over Simpson's suit because it is "a governmental unit of the State of Texas," it is entitled to sovereign immunity, and Simpson failed to show that her suit against MD Anderson fell under the limited waiver of sovereign immunity provided by the TTCA.[4]

According to MD Anderson, Simpson's friend had surgery at MD Anderson during the week of December 12, 2016. Simpson was at MD Anderson on the day of her friend's surgery and stayed with her friend in a patient room from December 13, 2016 until December 16, 2016. On the morning of December 15, 2016, at approximately 8:45 a.m., Simpson purportedly left her friend's patient room to get ice from the ice machine located down the hallway. As she walked down the hallway, she fell and broke her wrist. Simpson asserted that she slipped on a round-shaped patch of clear liquid, about three to five inches in diameter. Simpson allegedly did not know that a clear liquid had caused her to fall "until a person located near the nurse's station in the center of the floor purportedly stated after [Simpson's] f[a]ll, 'Oh my gosh. She slipped on that water. I knew we should've cleaned it up.'" According to MD Anderson, Simpson had "no knowledge of that

---

[3]     MD Anderson also filed a brief in support of its plea to the jurisdiction. We discuss together the arguments made in the plea to the jurisdiction and in the brief in support.

[4]     *See id.* § 101.021 ("Governmental Liability"); *see also id.* § 101.022.

3

person's identity or whether that person was an employee of MD Anderson," and Simpson did not know the identity of any of the persons who were present at the nurse's station. MD Anderson also asserted that it did not receive any reports of substances or liquids being spilled or present on the floor where Simpson fell during Simpson's stay at MD Anderson. And MD Anderson did not receive any reports of any person tripping, slipping, or falling on the floor where Simpson fell before Simpson's fall.

As to its immunity, MD Anderson asserted that it is a governmental unit entitled to sovereign immunity and Simpson had the burden of establishing waiver of MD Anderson's sovereign immunity for the trial court to have subject-matter jurisdiction over her suit. The TTCA expressly waives sovereign immunity in three general areas: use of publicly owned automobiles, premises defects, and injuries arising out of a condition or use of tangible personal property.[5] And as to premises defects, the TTCA limits the duty owed to a plaintiff to "the duty that a private person owes to a licensee on private property, unless the [plaintiff] pays for the use of the premises."[6] (Internal quotations omitted.) Such a duty requires a premises owner to "not injure a licensee by willful, wanton or grossly negligent conduct, and that the

---

[5] *See Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021.

[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a). It is undisputed that Simpson did not "pay[] for the use of the premises." *Id.*

4

owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware, and the licensee is not." (Internal quotations omitted.)

According to MD Anderson, to establish a breach of the duty owed by MD Anderson and a waiver of sovereign immunity, Simpson had to show that: (1) a condition of the premises created an unreasonable risk of harm to Simpson; (2) MD Anderson actually knew of the condition; (3) Simpson did not actually know of the condition; (4) MD Anderson failed to exercise ordinary care to protect Simpson from danger; and (5) MD Anderson's failure was a proximate cause of the injury to Simpson. If there was no evidence of one of these elements, MD Anderson's plea to the jurisdiction had to be granted.

Related to the third element, MD Anderson asserted that the evidence demonstrated that it "had no knowledge of [the presence of] any clear liquid that posed a slipping hazard to Simpson or anyone else." No one at MD Anderson reported a person slipping, tripping, or falling on the floor where Simpson fell before Simpson's fall. MD Anderson did not receive any reports of substances or liquids being spilled or present on the floor where Simpson fell during Simpson's entire stay at MD Anderson. And "no evidence exist[ed] that anyone employed by MD Anderson made any sort of statement such as: 'Oh my gosh! She slipped on that water. I knew we should have cleaned that up,'" as Simpson claimed. Because there

was no evidence of MD Anderson's actual knowledge of the condition that caused Simpson's fall, the TTCA did not waive MD Anderson's sovereign immunity and dismissal of Simpson's suit was required for lack of jurisdiction.

MD Anderson attached to its plea to the jurisdiction the deposition of Simpson, the declaration of Crystal L. McWhirter, MD Anderson's Risk Manager in the Legal Services Department, and the declaration of Jennifer Ketchum, an employee in MD Anderson's Division of Nursing Surgical Cohort Department.

In response to MD Anderson's plea to the jurisdiction, Simpson asserted that MD Anderson had "actual knowledge of the [presence of the] water on the floor of its premises that caused [Simpson] to fall, fracture her wrist[,] and undergo multiple surgeries." (Internal quotations omitted.) According to Simpson, she stayed in a patient room at MD Anderson with her friend, a patient, during the week of December 12, 2016. On December 15, 2016, Simpson fell and broke her wrist as she walked down the hallway to get ice for her friend. Immediately after her fall, a nurse wearing scrubs with a "larger build" came from behind MD Anderson's nurse's station and exclaimed, "Oh my gosh. She slipped in that water. I knew we should have cleaned it up." (Emphasis omitted.) (Internal quotations omitted.) Simpson also asserted that Dr. Mark V. Schaverien, a MD Anderson employee, testified that a person who came from behind the nurse's station would have been a MD Anderson employee because that area is a restricted area only for nursing. And

Robert Saladino, MD Anderson's Facilities Customer Advocate on the date of the incident, stated that when he arrived at the location after Simpson's fall, there was a yellow sign that said "caution" and "wet floor" near the area where Simpson had reportedly fallen. (Internal quotations omitted.) Based on Saladino's investigation "of the events leading to the placement of the sign," "the sign had been placed at th[e] location by the floor technician before mopping the area surrounding the sign." (Emphasis omitted.) (Internal quotations omitted.) Additionally, Simpson asserted that during discovery, MD Anderson failed to deny actual knowledge of the condition that caused Simpson's fall. Based on the foregoing, MD Anderson did not meet its initial burden to negate actual knowledge, but even if it did, Simpson stated that she had produced evidence of actual knowledge to create a fact issue which precluded the trial court from granting MD Anderson's plea to the jurisdiction.

Simpson attached to her response, among other things, her deposition, the deposition of Schaverien, and the declaration of Saladino.

In its reply to Simpson's response, MD Anderson reiterated that it had established its lack of actual knowledge of the presence of the liquid on the floor that caused Simpson's fall. And it asserted that Simpson failed to meet her burden to create a fact issue as to MD Anderson's actual knowledge because Simpson did not establish that the unidentified person, with a "larger build" and wearing scrubs that came from behind MD Anderson's nurse's station, was a MD Anderson employee

7

or that the "wet floor" sign was placed in the area before Simpson's fall. (Emphasis omitted.)

The trial court denied MD Anderson's plea to the jurisdiction.

## Standard of Review

We review de novo a trial court's ruling on a jurisdictional plea. *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 323 (Tex. 2006); *City of Houston v. Vallejo*, 371 S.W.3d 499, 501 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004); *Villarreal v. Harris Cty.*, 226 S.W.3d 537, 541 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A defendant may use a plea to the jurisdiction to challenge whether the plaintiff has met her burden of alleging jurisdictional facts or to challenge the existence of jurisdictional facts. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004).

When a plea to the jurisdiction challenges the existence of jurisdictional facts, we must consider relevant evidence submitted by the parties to resolve the jurisdictional issues. *Miranda*, 133 S.W.3d at 227. In reviewing such a plea, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Alamo Heights Indep.*

8

*Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018); *Miranda*, 133 S.W.3d at 228. However, we cannot disregard evidence necessary to show context or evidence and inferences unfavorable to the nonmovant if reasonable jurors could not do so. *See Alamo Heights*, 544 S.W.3d at 771.

This standard mirrors our summary-judgment standard under Texas Rule of Civil Procedure 166a(c) and places the burden on the governmental unit, as the movant, to meet the standard of proof to support its contention that the trial court lacks subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 228; *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). Once the governmental unit asserts and provides evidentiary support for its plea, the plaintiff is then required to show that a disputed fact issue exists on the jurisdictional issue. *Miranda*, 133 S.W.3d at 228. If the evidence creates a fact question on the jurisdictional issue, the trial court cannot grant the plea, and the fact issue is for the fact finder to resolve. *See Alamo Heights*, 544 S.W.3d at 771; *Miranda*, 133 S.W.3d at 227–28. If the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228.

**Plea to the Jurisdiction**

In its sole issue, MD Anderson argues that the trial court erred in denying its plea to the jurisdiction because the TTCA does not waive sovereign immunity for Simpson's suit.

Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions from lawsuits and liability for money damages. *Garcia*, 372 S.W.3d at 635; *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002); *see also Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist.*, 212 S.W.3d at 323–24 ("Sovereign immunity protects the State, its agencies, and its officials from lawsuits for damages."). Although the terms "sovereign immunity" and "governmental immunity" are often used interchangeably, sovereign immunity "extends to various divisions of state government, including agencies, boards, hospitals, and universities," while governmental immunity "protects political subdivisions of the State, including counties, cities, and school districts." *See Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist.*, 212 S.W.3d at 323–24; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. Eltonsy*, 451 S.W.3d 478, 481 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The University of Texas MD Anderson Cancer Center is a governmental unit generally entitled to sovereign immunity."); *Odutayo v. City of Houston*, No. 01-12-00132-CV, 2013 WL 1718334, at *2 n.8 (Tex. App.—Houston [1st Dist.]

Apr. 18, 2013, no pet.) (mem. op.). We interpret statutory waivers of sovereign immunity narrowly, as the Texas Legislature's intent to waive immunity must be clear and unambiguous. *See LMV-AL Ventures, LLC v. Tex. Dep't of Aging & Disability Servs.*, 520 S.W.3d 113, 120 (Tex. App.—Austin 2017, pet. denied); *see also* TEX. GOV'T CODE ANN. § 311.034. Without an express waiver of sovereign immunity or governmental immunity, courts do not have subject-matter jurisdiction over suits against the State or its political subdivisions. *State v. Shumake*, 199 S.W.3d 279, 283 (Tex. 2006); *Miranda*, 133 S.W.3d at 224–25.

The TTCA provides a limited waiver of immunity for certain suits against governmental units. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109; *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008); *City of Houston v. Garza*, No. 01-18-01069-CV, 2019 WL 2932851, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.); *City of Dallas v. Hillis*, 308 S.W.3d 526, 530 (Tex. App.—Dallas Mar. 30, 2010, pet. denied). MD Anderson is a governmental unit protected by sovereign immunity, absent waiver. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.001(3); *see also Eltonsy*, 451 S.W.3d at 481. Relevant here, the TTCA waives a governmental unit's immunity for a personal injury "caused by a condition or use of . . . real property if the governmental unit would, were it a private person, be liable to the [plaintiff] according to Texas law." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2); *see also Shumake*, 199

11

S.W.3d at 283 ("The [TTCA] includes, among other things, a limited waiver of the [S]tate's immunity from suits alleging personal injury . . . caused by premises defects."); *City of San Antonio v. Anderson*, No. 04-20-00320-CV, 2021 WL 883472, at *3 (Tex. App.—San Antonio Mar. 10, 2021, no pet.) (mem. op.) ("Under the [TTCA] a claim for a condition or use of real property is a premises defect claim . . . ."). It further provides that in premises defect cases, the governmental unit owes the plaintiff only the duty that a private person owes to a licensee on private property, unless the plaintiff paid for the use of the premises.[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a); *see also Shumake*, 199 S.W.3d at 283.

This limited duty requires the governmental unit, as the premises owner, to avoid injuring the plaintiff through willful, wanton, or grossly negligent conduct and to use ordinary care either to warn the plaintiff of, or make reasonably safe, a dangerous condition of which the governmental unit is aware and the plaintiff is not. *See Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384–85 (Tex. 2016); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 237 (Tex. 1992); *see also City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008). The governmental unit is liable to a plaintiff if it had actual knowledge of the condition that injured the

---

[7] It is undisputed that Simpson did not "pay[] for the use of the premises." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(a); *see also City of Irving v. Seppy*, 301 S.W.3d 435, 441 (Tex. App.—Dallas 2009, no pet.) ("If the plaintiff pays for the use of the premises, the governmental unit owes the plaintiff the duty owed to an invitee.").

12

plaintiff. *See Wilson v. Nw. Tex. Healthcare Sys., Inc.*, 576 S.W.3d 844, 850 (Tex. App.—Amarillo 2019, no pet.); *Wong v. Tenet Hosps. Ltd.*, 181 S.W.3d 532, 537 (Tex. App.—El Paso 2005, no pet.). Absent willful, wanton, or grossly negligent conduct,[8] a plaintiff must prove the following elements to establish the breach of the duty owed to her: (1) a condition of the premises created an unreasonable risk of harm to the plaintiff; (2) the governmental unit actually knew of the condition; (3) the plaintiff did not actually know of the condition; (4) the governmental unit failed to exercise ordinary care to protect the plaintiff from danger; and (5) the governmental unit's failure was a proximate cause of the injury to the plaintiff. *Sampson*, 500 S.W.3d at 391. If the governmental unit can show that there is no evidence of one of these elements, its plea to the jurisdiction must be granted. *Id.*

In its plea to the jurisdiction, MD Anderson argued that because it had no actual knowledge of the presence of the liquid on the floor on which Simpson slipped and fell, its plea to the jurisdiction must be granted. *See City of Stafford v. Svadlenak*, No. 14-18-00089-CV, 2018 WL 3734021, at *2 (Tex. App.—Houston [14th Dist.] Aug. 7, 2018, pet. denied) (mem. op.) (to establish waiver of immunity under TTCA, plaintiff must show, inter alia, that governmental unit had actual knowledge of dangerous condition at time of incident).

---

[8] Simpson did not allege that MD Anderson's conduct was willful, wanton, or grossly negligent.

Actual knowledge, rather than constructive knowledge, of the dangerous condition is the type of knowledge that is required. *Sampson*, 500 S.W.3d at 391–92. To prove actual knowledge, the plaintiff must show that the governmental unit actually knew of the dangerous condition at the time of the accident. *City of Corsicana v. Stewart*, 249 S.W.3d 412, 413–16 (Tex. 2008) ("Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time."). Knowledge of the possibility that the dangerous condition could develop over time is not enough. *See Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010); *Wilson*, 576 S.W.3d at 850. In determining whether the governmental unit had actual knowledge of a dangerous condition, "courts generally consider whether the [governmental unit] ha[d] received reports of prior injuries or reports of the potential danger presented by the condition." *Univ. of Tex.-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008); *see also Sampson*, 500 S.W.3d 392. "Actual knowledge of an unreasonably dangerous condition can sometimes be proven through circumstantial evidence." *City of Irving v. Seppy*, 301 S.W.3d 435, 444 (Tex. App.—Dallas 2009, no pet.). Circumstantial evidence establishes actual knowledge only when it "either directly or by reasonable inference" supports that conclusion. *See State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002).

14

In support of its plea to the jurisdiction, MD Anderson challenged the existence of jurisdictional facts with its own evidence that it had no actual knowledge of the presence of the liquid on the floor before Simpson fell and thus owed Simpson no duty as a licensee. *See Miranda*, 133 S.W.3d at 228 (discussing burdens generally); *City of Dallas v. de Garcia*, No. 05-20-00636-CV, 2021 WL 777087, at *2 (Tex. App.—Dallas Mar. 1, 2021, no pet.) (mem. op.) (governmental unit had initial burden of presenting evidence sufficient to negate jurisdiction). MD Anderson's evidence included the deposition of Simpson, the declaration of McWhirter, MD Anderson's Risk Manager in the Legal Services Department, and the declaration of Ketchum, an employee in MD Anderson's Division of Nursing Surgical Cohort Department.

In her declaration, McWhirter stated that, as Risk Manager in the Legal Services Department of MD Anderson, she had access to the records maintained by the Legal Services Department "concerning reports of injuries sustained by any person" and "reports of the physical state or condition of [MD Anderson] facilities creating situations or circumstances that c[ould] pose a risk of injury or harm to any person." According to McWhirter, employees involved with Risk Management in the Legal Services Department, receive and preserve such reports, and the records available to her would "include reports of persons injured after having slipped, tripped, and/or fallen inside MD Anderson facilities[] and reports of substances,

15

materials[,] or objects present in the accessible or walkable areas of [MD Anderson] facilities that could pose a slipping, tripping, and/or falling hazard."

McWhirter stated that she had reviewed the records of the Legal Services Department to determine if there were any reports made concerning water, liquids, or substances spilled or present on the floors from December 12, 2016 through December 15, 2016. The only report was dated December 15, 2016 and concerned Simpson "slipping and falling on floor P11 of the Lutheran Pavilion at MD Anderson." McWhirter searched for other reports before December 15, 2016 of anything regarding water, liquids, or substances or persons tripping, slipping, or failing on "floor P11," where Simpson fell, and "found none." *See Reed*, 258 S.W.3d at 622–23 (holding governmental unit lacked actual knowledge where there had been no prior accidents or complaints about road condition); *City of Dallas*, 2021 WL 777087, at *2 ("[T]estimony stating that a governmental unit did not receive reports of a hazardous condition in the two years before the injury—require[d] [the court] to conclude the [governmental unit's] evidence [was] sufficient to demonstrate a lack of actual knowledge . . . [and] the [governmental unit] ha[d] met its initial burden . . . ."); *Harris Cty. Hosp. Dist. v. Peavy*, No. 14-19-00953-CV, 2020 WL 6142887, at *2–3 (Tex. App.—Houston [14th Dist.] Oct. 20, 2020, no pet.) (mem. op.) (to meet its initial burden, governmental unit attached affidavits stating that no department records showed "reports or notifications of any incident, fall, near fall,

16

trip, or slip, or injury attributable to the door brace (floor strike plate) located in the hallway on the first floor" where plaintiff fell (internal quotations omitted)); *City of Dallas v. Kennedy*, No. 05-19-01299-CV, 2020 WL 3286515, at \*3 (Tex. App.—Dallas June 18, 2020, no pet.) (mem. op.) (governmental unit's evidence that no records showed any call, report, or complaint "regarding an eroded, broken, or depressed area of tile, or any other defects in the flooring in the area of the doorways located on the premises" where plaintiff was injured negated actual knowledge (internal quotations omitted)); *Tarrant Cty. v. Carter-Jones*, No. 02-17-00177-CV, 2018 WL 547588, at \*5 (Tex. App.—Fort Worth Jan. 25, 2018, no pet.) (mem. op.) (governmental unit's evidence, which included affidavit that "facilities-management department's records . . . contain[ed] no reference to any knowledge on the part of [the governmental unit] or any of its employees of a water hazard," established that it did not have actual knowledge of water in hallway at time of plaintiff's fall (internal quotations omitted)).

In her deposition, Simpson testified that on December 15, 2016, she was staying in a patient room at MD Anderson with her friend, who was a patient at MD Anderson. Around 8:45 a.m. or 9:00 a.m., she left her friend's room and walked down the hallway to get some ice from the ice machine. After walking "four [or five] doors down," Simpson slipped and fell, breaking her wrist and injuring her shoulder and knee. Simpson stated that she "slipped on a puddle of [clear] water,"

17

but she did not know that at the time that she fell. She estimated that the puddle was three to five inches in diameter. Simpson did not see the water before she fell, and she did not know how the water had "got[ten] there."

Simpson further testified that as she walked down the hallway before her fall, she did not see anyone "cleaning up around the hall" and did not see anyone "making any kind of repair or [doing] any other kind of activity." Simpson did not see any floor signs about a "wet floor," and there were not any "wet floor" signs present when she slipped and fell. As to who was at the nearby nurse's station at the time of her fall, Simpson stated that she saw doctors and "other people," but she also testified that she had no knowledge about any persons present at the nurse's station at the time she fell. And she testified that she did not know "what type of medical professional was present at the nurse's station at the moment" that she fell.

According to Simpson, after she fell, "a nurse from th[e] nurse's station . . . came up to [her] and said, 'Oh, my gosh. She slipped on that water. I knew we should've cleaned it up.'" The woman then asked "somebody," who Simpson did not see, "to have somebody come clean up the water." Simpson had no knowledge about the person the woman was speaking to—that person was just one of the people standing around Simpson. Simpson also explained that she did not actually know who the woman who spoke was, but the woman was standing at the nurse's station and she appeared "[v]ery quickly" after Simpson's fall. Yet,

18

Simpson did not know what the woman was doing at the nurse's station, and Simpson could not remember what the woman looked like. Simpson stated that the woman was wearing scrubs and had a "larger build," but Simpson did not see any identification badges on the woman, could not recall the color of the woman's scrubs, and did not know the woman's name. The woman stated that she was going to get a nurse supervisor. Ultimately though, Simpson testified: "I do not know for a fact that she was a nurse." And Simpson acknowledged that, while staying with her friend at MD Anderson, she saw patients and visitors in the hospital. Simpson did not see anyone from the medical staff getting ice on December 15, 2016 before she fell.

In her declaration, Ketchum stated that as a result of her employment with MD Anderson in the Division of Nursing Surgical Cohort Department, she had "observed outside visitors who [were] not affiliated with MD Anderson wear[ing] scrubs while inside MD Anderson facilities on multiple occasions." She had also seen "outside visitors at or inside the nurse['s] stations" in MD Anderson. Those people were "asking questions and taking supplies such as towels." Ketchum had seen "outside visitors wear[ing] scrubs while staying overnight with MD Anderson patients."

Because MD Anderson met its initial burden of presenting evidence sufficient to negate jurisdiction, the burden shifted to Simpson to raise a fact issue as to

whether MD Anderson had actual knowledge of the presence of the liquid on which Simpson slipped and fell. *See Sampson*, 500 S.W.3d at 391–92; *City of Dallas*, 2021 WL 777087, at \*2; *Univ. of Tex. v. Bellinghausen*, No. 03-14-00749-CV, 2016 WL 462735, at \*3 (Tex. App.—Austin Feb. 3, 2016, no pet.) (mem. op.) ("Because the [governmental unit] presented evidence to support a finding that it did not have actual knowledge of an unreasonably dangerous condition of the sidewalk, it met its burden to present evidence to support its plea to the jurisdiction. . . . The burden then shifted to [the plaintiff] to present evidence to create a fact issue as to the [governmental unit]'s actual knowledge.").

In the trial court, to raise a fact issue as to MD Anderson's actual knowledge, Simpson relied on her deposition testimony to support her assertion that a nurse from MD Anderson told Simpson that she knew about the water before Simpson's fall. In her deposition, Simpson testified that after she fell, a "nurse from th[e] nurse's station . . . came up to [her] and said, 'Oh, my gosh. She slipped on that water. I knew we should've cleaned it up.'" According to Simpson, the woman who approached her was wearing scrubs and arrived "[v]ery quickly because she was standing right there at the nurse's station." Yet, Simpson also testified that she did not know what the woman was doing at the nurse's station, she did not see any identification badges on the woman, and she did not know what color scrubs the woman was wearing or who the woman was. Simpson acknowledged that she "d[id]

20

not know for a fact that [the woman] was a nurse." *See Carter-Jones*, 2018 WL 547588, at *5 (plaintiff did not raise fact issue about governmental unit's actual knowledge, where plaintiff could not identify "blonde-haired woman wearing purple gloves [who] said that she knew that 'water was there'" as employee of governmental unit). And Simpson stated that she saw "other people," apart from medical staff, at the nurse's station before her fall. *See City of Dallas*, 2021 WL 777087, at *2 ("Although circumstantial evidence can be used to establish actual knowledge, evidence that merely raises a suspicion that the governmental unit had actual knowledge is insufficient."); *Bellinghausen*, 2016 WL 462735, at *6 (evidence that creates nothing more than mere suspicion that governmental unit had actual knowledge of condition does not create fact issue); *see also Sampson*, 500 S.W.3d at 395–96.

Simpson also relied on the deposition of Schaverien, a MD Anderson employee, to support her assertion that the woman at the nurse's station who approached Simpson after her fall had to be a MD Anderson employee, rather than someone else. Schaverien, in his deposition, stated that he could not recall Simpson or her falling incident at MD Anderson. But as to the nurse's stations at MD Anderson, Schaverien testified that there was no policy stating that the nurse's stations were for nurses and doctors only, and there were no signs that prohibited an "outside visitor" from accessing a nurse's station. There were also not any

21

"protocols concerning the nurse[']s stations at MD Anderson." The nurse's stations were not locked to visitors or the general public; they were "free area[s] for people" and not "controlled area[s]." According to Schaverien, "there [were] essentially four entrances" to a nurse's station that were "just open walkways into" the nurse's station. No one was stationed at the nurse's station, and "[t]here[] [was] no door or padlock or parcel." Schaverien stated that "[t]here[] [was] no rule [that] you don't go in there" and there was a possibility that "other people" would be in the nurse's station. The nurse's stations were "open," "so people could walk through there who [were not] necessarily nurs[es] or doctors." In Schaverien's opinion, "[i]t would be very straightforward for somebody to get in there." "It[] [was] just a walkway that somebody could walk through," and Schaverien stated that it was possible that a patient could be in the nurse's station if he or she needed something. It was also possible for a visitor or a non-MD Anderson employee to "freely go into the nurse[']s station" because there would be "no restriction of physical access." *See Univ. of Tex. at El Paso v. Muro*, 341 S.W.3d 1, 5–6 (Tex. App.—El Paso 2009, no pet.) ("When circumstantial evidence presents two equally plausible, but opposite inferences, neither can be inferred.").

Schaverien did testify that he had not "seen anyone other than nurses and doctors at a nurse[']s . . . station" and his "assumption" was that the nurse's stations were "only for doctors and nurses." But he stated that his assumption was based on

22

the culture, and he was only "hypothesizing." His assumption was not "based on anything that [he] ha[d] actually seen." Schaverien also stated that he did not go into the nurse's stations and he never used the nurse's stations. He could not recall the last time he had been in a nurse's station, and he stated that he "wouldn't necessarily be the person to ask" or the "best person . . . to ask" because he did not "go into those areas at all." Schaverien testified that the proper person to seek out information on the nurse's stations would be a nurse. Finally, Schaverien stated that it was possible that someone could be wearing scrubs inside of MD Anderson who was not an MD Anderson employee.

Simpson also relied on the declaration of Saladino, MD Anderson's Facilities Customer Advocate on the date of Simpson's fall, to raise a fact issue as to MD Anderson's actual knowledge. In his declaration, Saladino stated that on December 15, 2016, he received a report that Simpson had "fallen on floor P11 of the Lutheran Pavilion Building of MD Anderson." After the fall, Saladino went to the location of the fall and saw "a yellow sign that said 'caution' and 'wet floor.'" Saladino explained that his investigation "of the events [that led] to the placement of the sign revealed that the sign had been placed at th[e] location by [a] floor technician" before the technician mopped the area surrounding the sign.

Saladino's declaration did not state that there was a "yellow sign that said 'caution' and 'wet floor'" present when Simpson fell—only that it was present when

23

a floor technician mopped the floor. And Simpson testified in her deposition that she did not see any floor signs about a "wet floor," and there were not "wet floor" signs present when she slipped and fell. *See Stewart*, 249 S.W.3d at 413–16 (to prove actual knowledge, plaintiff must show that governmental unit actually knew of dangerous condition at time of accident). Simpson also testified that after she fell, and while she was waiting for a gurney, "somebody . . . clean[ed] up the water" using a mop and paper towels. Simpson did not know that person's identity and did not know if the person was a "maintenance person or somebody else." But her testimony showed that no one mopped the floor until after Simpson's fall, meaning that the yellow-caution-wet-floor sign could not have been placed before Simpson's fall.

Based on the record before us, we conclude that Simpson did not raise a fact issue regarding MD Anderson's actual knowledge of the presence of the liquid on the floor on which Simpson slipped and fell. As a result, Simpson's premise defect claim under the TTCA is barred by sovereign immunity. Thus, we hold that the trial court erred in denying MD Anderson's plea to the jurisdiction.

We sustain MD Anderson's sole issue.

## Conclusion

We reverse the trial court's order denying MD Anderson's plea to the jurisdiction and render judgment dismissing Simpson's suit for lack of subject-matter jurisdiction.

Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Landau and Countiss.